## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE

EXPRESS SCRIPTS, INC.; ACCREDO
HEALTH GROUP, INC.; EXPRESS
SCRIPTS PHARMACY, INC.; ESI MAIL
PHARMACY SERVICE, INC.; EXPRESS
SCRIPTS SPECIALTY DISTRIBUTION
SERVICES, INC.; LYNNFIELD DRUG, INC.
d/b/a FREEDOM FERTILITY PHARMACY;
LYNNFIELD COMPOUNDING CENTER,
INC. d/b/a FREEDOM FP FERTILITY
PHARMACY; VILLAGE FERTILITY
PHARMACY, LLC; HEALY PHARMACY,
LLC d/b/a VILLAGE FERTILITY
PHARMACY; INTEGRITY RX SPECIALTY
PHARMACY LLC; and MAH PHARMACY,
LLC d/b/a EVERNORTH ENGUIDE
PHARMACY,

          Plaintiffs,

      v.

MARLIN BLANE, in his official capacity as
President of the Tennessee State Board of
Pharmacy; REBECCA LEINART, in her
official capacity as Vice President of the
Tennessee State Board of Pharmacy;
SHANEA MCKINNEY, DAVID BROWN,
JAKE BYNUM, BROOKE MILLS,
MATTHEW PHILLIPS, MELISSA BORUFF,
and NICHOLE FOSTER, in their official
capacities as members of the Tennessee State
Board of Pharmacy; LUCY SHELL, in her
official capacity as Executive Director of the
Tennessee State Board of Pharmacy; and
JONATHAN SKRMETTI, in his official
capacity as Attorney General of the State of
Tennessee,

          Defendants.

Civil Action No. _____

**COMPLAINT FOR
DECLARATORY AND
INJUNCTIVE RELIEF**

Plaintiffs Express Scripts, Inc.; Accredo Health Group, Inc.; Express Scripts Pharmacy, Inc.; ESI Mail Pharmacy Service, Inc.; Express Scripts Specialty Distribution Services, Inc.; Lynnfield Drug, Inc. d/b/a Freedom Fertility Pharmacy; Lynnfield Compounding Center, Inc. d/b/a Freedom FP Fertility Pharmacy; Village Fertility Pharmacy, LLC; Healy Pharmacy, LLC d/b/a Village Fertility Pharmacy; Integrity Rx Specialty Pharmacy LLC; and MAH Pharmacy, LLC d/b/a Evernorth EnGuide Pharmacy allege as follows:

## INTRODUCTION

1. Plaintiffs—Express Scripts, Inc. ("ESI") and its affiliated pharmacies—bring this action to challenge a recently enacted Tennessee law known as the Freedom, Access, and Integrity in Registered Pharmacy Act ("Act"). The Act, which is attached as Exhibit A, bars any pharmacy affiliated with a Pharmacy Benefits Manager ("PBM") and a health insurance issuer from operating in the state. The Act violates federal law in several ways, any one of which suffices to enjoin it, and it will inflict enormous harm not only on Plaintiffs and their thousands of patients, partners, and employees in Tennessee, but also on their patients and partners beyond Tennessee.

2. Tens of millions of Americans, including millions in Tennessee alone, rely on PBM-affiliated pharmacies for their prescription medications. For example, Plaintiff Accredo Health Group, Inc. ("Accredo")—which has a significant portion of its nationwide operations in Memphis—serves more than 1.3 million Americans, including tens of thousands of Tennesseans, who have complex and chronic medical conditions, including cancer, bleeding disorders, multiple sclerosis, and a range of rare diseases. Accredo not only provides safe and convenient access to specialty medications (which can be expensive, require specialized storage and handling, clinical monitoring, and frequent dose adjustments), but also offers personalized (including in-home)

1

clinical counseling and support from specialized pharmacists, nurses, dieticians, and social workers.

3.      Accredo has a large pharmacy operation in Memphis, which is licensed to serve patients in 53 states and U.S. territories.  Last year, the Memphis pharmacy dispensed more than 2.3 million prescriptions to nearly half a million patients nationwide, including more than 128,000 prescriptions to nearly 26,000 patients in Tennessee.  In addition, Accredo's specially trained nurses provided over 10,000 hours of care to Tennessee patients in their homes last year.  And Accredo's Memphis pharmacy dispensed over 15,000 prescriptions to more than 3,000 Tennessean beneficiaries of the U.S. Department of Defense's TRICARE program, a statutorily mandated program that provides healthcare services to military members, retirees, and their families. Nationwide, the Memphis pharmacy dispensed over 186,000 medications to more than 41,000 TRICARE beneficiaries in 2025.

4.      Plaintiffs Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. (together, "Express Scripts Pharmacy") are national mail-order pharmacies that delivered more than 2 million prescriptions to over 147,000 patients throughout Tennessee in 2025 alone.  Express Scripts Pharmacy's mail-order service is a vital resource for Tennesseans, over a third of whom live in rural areas that often lack brick-and-mortar pharmacies.  Express Scripts Pharmacy has also served for more than 20 years as the principal mail-order pharmacy provider for TRICARE and, last year alone, dispensed more than 734,000 prescriptions to nearly 45,000 TRICARE beneficiaries in Tennessee.

5.      Two other ESI-affiliated pharmacy groups provide fertility-related prescriptions across Tennessee and the country.  In 2025, Plaintiffs Village Fertility Pharmacy, LLC, Healy Pharmacy, LLC d/b/a Village Fertility Pharmacy, and Integrity Rx Specialty Pharmacy LLC

2

(together referred to as VFP Pharmacy Group ("VFP")) dispensed more than 12,000 prescriptions to over 3,200 patients across Tennessee to help them grow their families. And Plaintiffs Lynnfield Drug, Inc. d/b/a Freedom Fertility Pharmacy and Lynnfield Compounding Center, Inc. d/b/a Freedom FP Fertility Pharmacy (together referred to as "Freedom Fertility") delivered more than 9,000 fertility prescriptions to over 800 Tennesseans in 2025.

6.      Other ESI-affiliated pharmacies specialize in areas like sleep disorders and GLP-1 medications. In 2025, MAH Pharmacy, LLC d/b/a Evernorth EnGuide Pharmacy ("EnGuide") dispensed more than 16,000 GLP-1 prescriptions to over 8,000 patients in Tennessee. And Express Scripts Specialty Distribution Services, Inc. ("ESSDS") dispensed more than 6,500 medications to nearly 800 Tennesseans who suffer from complex sleep disorders.

7.      In all, over 180,000 Tennesseans rely on ESI-affiliated pharmacies today, including individuals with commercial prescription-drug benefits through their employers or insurers, seniors, military servicemembers and their families, and other beneficiaries. These Tennesseans run the gamut from those who require routine maintenance medications to sustain their health and vitality to those with complex and grave medical conditions whose lives depend on continuous access to medication provided by specialty pharmacies, and everyone in between.

8.      The Act imperils the health of all these individuals, for the benefit of Tennessee-based pharmacies and their supporters that spearheaded the legislation in order to eliminate out-of-state competition and thus increase their market share. Indeed, the Act's text, context, and legislative history make clear that the statute's purpose and effect is to protect local pharmacies domiciled in Tennessee from out-of-state competition.

9.      Federal law—specifically the negative component of the U.S. Constitution's Commerce Clause known as the dormant Commerce Clause—forbids such discrimination. And

3

it is easy to understand why: Allowing Tennessee (and hence every other state in the country) to banish out-of-state competitors out of concern for local, independent business interests would undermine the benefits of free-market competition—harming consumers, for example, by driving up prices. And if states can inflict this harm in the prescription-drug sector, then they can do the same in others. Imagine, for example, a bill that bans out-of-state movie streaming services such as Netflix from serving customers in Tennessee because movie streaming services compete with local, independent movie theaters. Myriad additional examples of similar protectionist legislation involving a range of businesses, from grocery and hardware stores to gas stations, are easy to envision.

10. Moreover, as applied to Plaintiffs, the Act is not only barred by the dormant Commerce Clause but also preempted by three sets of federal statutes and regulations: (1) TRICARE, which as noted covers pharmacy services and other health benefits to military servicemembers, retirees, and their families; (2) Medicare Part D; and (3) the Employee Retirement Income Security Act of 1974 ("ERISA").

11. Indeed, a very similar law, Arkansas Act 624, was preliminarily enjoined last year as likely violating the dormant Commerce Clause and likely being preempted by TRICARE. *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057 (E.D. Ark. July 28, 2025), *appeal pending*, No. 25-2529 (8th Cir.). As the Tennessee Act's supporters stated, the Tennessee law "aligns with Arkansas' Act 624 of 2025, which established similar ownership restrictions." *2026 Legislative Updates*, Tennessee Pharmacists Association (Jan. 27, 2026), https://tinyurl.com/5xbfdbaa.

12. In an apparent effort to avoid a similar TRICARE-preemption ruling here, the Tennessee Act purports to carve out "pharmacy services provided pursuant to a contract with the United States government." SB2040 §2(j). That effort to avoid TRICARE preemption fails

4

because the Act prohibits the commercial services on which ESI's TRICARE contract depends and thus materially interferes with Plaintiffs' performance of their obligations under the TRICARE contract. Indeed, ESI's TRICARE contract presupposes and leverages ESI's pharmacies' commercial operations, requiring those pharmacies to maintain inventory from their commercial business to dispense mail-order and specialty prescriptions to TRICARE beneficiaries (and then receive "replenishment" of inventory from the federal government's wholesale pharmaceutical distributor). And even if ESI's pharmacies could in theory sustain their mail-order and specialty pharmacy services for Tennessean TRICARE beneficiaries by relying entirely on commercial inventory from outside Tennessee (and shipping prescriptions into the state), that is immaterial. In determining whether the Act is preempted by federal law, the relevant question is whether *every* state can do what Tennessee has done, i.e., whether it would interfere with the TRICARE program or otherwise be preempted for all 50 states to banish Plaintiffs from their territory. The answer is a resounding yes: Such a nationwide ban would unquestionably obstruct the mail-order and specialty pharmacy services ESI is obligated to provide under the TRICARE contract.

13. The Act will inflict enormous harm both in Tennessee and nationwide. First, it will harm patients, depriving them of the pharmacies they rely on: In addition to shuttering many brick-and-mortar retail pharmacies, the Act will prevent many of the major national mail-order pharmacies (including Plaintiffs) from delivering drugs to patients in Tennessee. Second, the Act will force Accredo (and related pharmacies) to shut down its Memphis pharmacy operations—which employ more than 1,200 people across the state, hold approximately $900 million in inventory on any given day, serve nearly half a million patients across the country (including tens of thousands in Tennessee), and provide in-home clinical services and care to Tennesseans.

14. In addition to harming patients and employees, the Act inflicts serious harm directly on ESI and its affiliated pharmacies by banishing them from the state. And contrary to what supporters of the law may think (or might have thought in passing it), ESI and its affiliated pharmacies cannot avoid that harm by simply parting ways. Dismantling the organization in this way is neither practical nor feasible, because ESI and its affiliated pharmacies have longstanding, deeply interwoven common ownership and business relationships. They have worked tirelessly over decades to improve these synergies to provide best-in-class integrated PBM and pharmacy services to plan sponsors and their members. And these tight-knit relationships are precisely what enable ESI to provide critical, safe, and affordable pharmacy and benefit-management services to hundreds of thousands of Tennesseans, creating efficiencies that lead to lower prices, improved patient care, and better patient service.

15. Because the Act is unconstitutionally protectionist and preempted by federal law, its enforcement must be enjoined.

## PARTIES

### A. Plaintiffs

16. ESI is a Delaware corporation that has its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

17. Accredo is a Delaware corporation that has its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

18. Express Scripts Pharmacy, Inc. is a Delaware corporation that has its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

19. ESI Mail Pharmacy Service, Inc. is a Delaware corporation that has its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

6

20.     ESSDS is a Delaware corporation that has its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

21.     Lynnfield Drug, Inc. and Lynnfield Compounding Center, Inc. are Florida corporations, each of which has its principal place of business at 374 Merrimac Street, Newburyport, Massachusetts 01950.

22.     Village Fertility Pharmacy, LLC is a Delaware company with its principal place of business at 335 Bear Hill Road, Suite 1, Waltham, Massachusetts 02451.

23.     Healy Pharmacy, LLC is a Delaware company with its principal place of business at 4580 Weaver Parkway, Suite 103, Warrenville, Illinois 60555.

24.     Integrity Rx Specialty Pharmacy LLC is an Arizona company with its principal place of business at 8425 North 90th Street, Suite 8, Scottsdale, Arizona 85258.

25.     EnGuide is a Delaware company with its principal place of business at 1 Express Way, Saint Louis, Missouri 63121.

**B.     Defendants**

26.     Marlin Blane is the president of the Tennessee State Board of Pharmacy ("Board"). He is sued in his official capacity and, as such, is a resident of Tennessee.

27.     Rebecca Leinart is the vice president of the Board.  She is sued in her official capacity and, as such, is a resident of Tennessee.

28.     Shanea McKinney, David Brown, Jake Bynum, Brooke Mills, Matthew Phillips, Melissa Boruff, and Nichole Foster are members of the Board.  Each is sued in his or her official capacity.  As such, each is a resident of Tennessee.

29.     Lucy Shell is the executive director of the Board.  She is sued in her official capacity and, as such, is a resident of Tennessee.

7

30.     Jonathan Skrmetti is the attorney general of Tennessee.  He is sued in his official capacity and, as such, is a resident of Tennessee.

## JURISDICTION AND VENUE

31.     This action arises under the U.S. Constitution, the federal statutes establishing the TRICARE program and Medicare Part D, and ERISA.  This Court thus has subject matter jurisdiction under 28 U.S.C. §1331.  The Court is authorized to issue the relief sought pursuant to the Civil Rights Act of 1871, 42 U.S.C. §1983; the Declaratory Judgment Act, 28 U.S.C. §§2201-2202; the All Writs Act, 28 U.S.C. §1651; and *Ex parte Young*, 209 U.S. 123 (1908).

32.     Venue is proper in this district under 28 U.S.C. §1391(b)(1) because all Defendants sued in their official capacities are either officers of the Board, which is located at 665 Mainstream Drive, Nashville, Tennessee, or the Attorney General, whose office is located at 500 Charlotte Avenue, Nashville, Tennessee.  As such, all Defendants are residents of Tennessee and reside in this district.  Venue is also proper under 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this action occurred in this district.

## FACTUAL ALLEGATIONS

I.     **PBMS LOWER THE COST OF PRESCRIPTION DRUGS AND STREAMLINE PHARMACY OPERATIONS FOR HEALTH PLAN SPONSORS AND PATIENTS**

33.     Most Americans do not pay the list price for their prescription drugs.  Instead, most prescription drugs are paid for in part through health insurance plans.  The sponsors of these plans include employers, labor unions, and insurers.  Federal, state, and municipal governments also provide prescription-drug benefits through programs such as TRICARE, Medicare, Medicaid, and workers' compensation.

34.     Health plan sponsors frequently contract with PBMs to help manage prescription-drug benefits, including by providing administrative services to improve the efficiency and quality

8

of benefits and by negotiating lower costs for prescription drugs. PBMs are the only entities in the prescription-drug supply chain whose purpose is to help plan sponsors and their members pay less for prescription drugs.

35.     Tennessee apparently recognizes all this, because the state itself contracts with a PBM to manage prescription-drug benefits for its employees. *See Pharmacy Benefits*, Tennessee Government Partners for Health, https://www.tn.gov/partnersforhealth/health-options/pharmacy.html (last visited June 11, 2026). Thus, like thousands of other health plan sponsors across the nation, Tennessee provides its employees with critical drug benefits that PBMs deliver.

36.     When a member of a health plan that contracts with a PBM visits or contacts a pharmacy to fill a prescription, the pharmacy (through an electronic system) checks with the plan's PBM to determine the member's coverage and copay information. The PBM also performs thousands of health and safety checks regarding the prescription for potential contraindications and drug interactions for the member, and will—within seconds—provide a message back to the pharmacy about the status of the member's prescription claim. After the member pays the copayment (if any) and receives the medication, the PBM reimburses the pharmacy for the medication at a contractually determined rate (which may be, including in Tennessee, subject to a state-law minimum). The plan sponsor, in turn, reimburses the PBM for the prescription at a contractually determined rate.

37.     The discounts, savings, and efficiencies that PBMs secure for health plan sponsors allow sponsors to reduce premiums and out-of-pocket costs for members.

38. One primary way PBMs create savings for health plan sponsors and members is by negotiating reimbursement rates with pharmacies. By negotiating lower rates, PBMs reduce the cost of prescription-drug coverage for plan sponsors and members.

39. Another way PBMs create savings is by negotiating with drug manufacturers to obtain discounts on prescription drugs. By aggregating volume over multiple plan sponsors and by specializing in the bargaining process, PBMs negotiate lower prices than individual plan sponsors could. This saves plan sponsors and patients tens of billions of dollars every year.

40. PBMs also provide numerous other services that improve the quality of benefits and create efficiencies for health plan sponsors and members, such as processing prescription claims. For example, ESI adjudicates over a billion prescription claims each year from its network pharmacies, with each prescription undergoing more than 18,000 safety, quality, and benefit checks within seconds of being submitted at the pharmacy counter. ESI's affiliated pharmacies also dispense medications with a near-perfect accuracy rate. For example, in 2025, Express Scripts Pharmacy dispensed medications with 99.999328% accuracy for Tennessee patients. Similarly, Accredo's accuracy rate for Tennessee patients in 2025 was 99.997031%.

41. Some PBMs—including the nation's three largest (ESI, CVS Caremark, and Optum Rx)—own or share common ownership with pharmacies. Such PBM-affiliated pharmacies offer simplified payment procedures, aggregated information regarding drug safety and efficacy, and other efficiencies that make access to prescription drugs more convenient and affordable, creating more positive patient experiences.

42. Today, millions of Tennesseans—including military members, seniors, patients with specialty-drug needs, and patients pursuing fertility treatments—fill their prescriptions at PBM-affiliated pharmacies.

10

43. PBM-affiliated pharmacies compete with one another and with independent and non-PBM-affiliated chain pharmacies in a robust market that serves patients with diverse clinical needs. This competition occurs in Tennessee today and results in superior pharmacy services for residents.

44. PBM-affiliated pharmacies have not displaced independent pharmacies. To the contrary, the number of independent pharmacies has increased in recent years, both nationwide and in Tennessee. *See* Carlton et al., *PBMs and Prescription Drug Distribution: An Economic Consideration of Criticisms Levied Against Pharmacy Benefit Managers* at 101-102, Compass Lexecon (Apr. 2025); *Tennessee State Facts & Resources*, PCMA Net, https://www.pcmanet.org/state2_item/tennessee/.

45. Although PBMs can perform a number of valuable services for health plan sponsors, it is the plan sponsors—not PBMs—that exercise control over how to design their prescription-drug benefits and how to allocate resources. This includes wide discretion over (1) the list of drugs, or "formulary," that will be covered under a plan; (2) the types of pharmacies that will be included in a plan's pharmacy network; (3) whether there are premiums and the amount of those premiums; (4) whether there are deductibles and the amount of those deductibles; (5) whether there are coinsurance or copay obligations and the amount of those obligations; and (6) whether there will be utilization-management measures—such as prior-authorization or step therapy requirements—tied to any given medication.

46. In designing their benefit plans, sponsors often consider cost-effective ways to create safe and reliable access to pharmacy services, to maximize the health and vitality of their members. One such way has been the use of mail-order pharmacy services. Health plans that cover members in multiple states—for example, plans sponsored by larger regional or nationwide

employers—often select a single mail-order pharmacy that can serve members throughout the United States, an arrangement that relies on those mail-order pharmacies being able to offer services on a nationwide basis. Typically, members have lower copayments if they opt to use mail-order pharmacy services.

## II. PHARMACIES AFFILIATED WITH ESI SERVE HUNDREDS OF THOUSANDS OF PATIENTS ACROSS TENNESSEE

47. Plaintiff pharmacies (Accredo, Express Scripts Pharmacy, ESSDS, Freedom Fertility, VFP, and EnGuide) are each affiliated by common ownership with ESI. ESI is a PBM that is a subsidiary of Evernorth Health, Inc., which is a subsidiary of The Cigna Group, a holding company that also holds Cigna Healthcare, a health insurance issuer, as a subsidiary. As noted, each Plaintiff pharmacy has offered safe, reliable, and convenient pharmacy services to patients throughout Tennessee for years, and several have done so for decades.

48. Accredo is a nationally accredited specialty pharmacy, with substantial operations in Memphis, that serves patients in Tennessee and nationwide with complex and chronic conditions, including cancer, hepatitis C, HIV, hemophilia, rheumatoid arthritis, multiple sclerosis, and many rare diseases. Last year it dispensed over 168,000 prescriptions to over 32,000 patients in Tennessee. It is one of a limited number of pharmacies with URAC Center of Excellence Rare Disease accreditation. Accredo has been licensed to operate in Tennessee since 1996 and has always been in good standing.

49. Many of the specialty medications Accredo offers are ones that the manufacturer has chosen to make available only through a single specialty pharmacy (exclusive distribution) or a small number of specialty pharmacies (limited distribution). Drug manufacturers establish exclusive- and limited-distribution networks to ensure patient safety—for example, by choosing to work with pharmacies that have the expertise necessary to provide specialized patient support

and to meet stringent storage and handling protocols. Accredo is the exclusive distributor for over 20 medications treating a range of conditions, including certain types of cancer and spinal-muscular atrophy. Some Accredo patients therefore critically need medicines that they cannot get anywhere else. Accredo is also proud to be able to dispense several limited-distribution medications (medications treating conditions like pulmonary arterial hypertension and muscular dystrophy) because of the high-quality clinical services and support it provides.

50. Because many specialty medications are expensive, Accredo provides billing specialists to help patients navigate out-of-pocket costs and connect them with copay assistance where available. In addition to convenient and affordable access to specialty medications and related items (such as infusion pumps and other devices often needed to administer the medications), Accredo offers personalized clinical-counseling and therapeutic-care services from specially trained pharmacists, nurses, dieticians, and social workers to help patients manage their complex conditions and treatments. For instance, Accredo's specially trained infusion nurses provide face-to-face care in the comfort of patients' homes. Accredo aims to partner patients with the same nurse for each home visit, resulting in stronger bonds between patients and their caregivers, which in turn can lead to better adherence to medication and improved health outcomes. In 2025, Accredo's specially trained nurses provided over 10,000 hours of care to patients in their homes in Tennessee.

51. Express Scripts Pharmacy is a nationally accredited home-delivery pharmacy that delivered more than 2 million prescriptions to over 147,000 patients throughout Tennessee last year. Doctors submit prescriptions to Express Scripts Pharmacy electronically, and patients can conveniently refill and renew prescriptions by phone or on the pharmacy's website or mobile app. Express Scripts Pharmacy offers free standard shipping and uses packaging that is confidential,

tamper-evident, and weather-resistant.  For medications that require specific temperature control, it uses special packaging and coolant packs, adjusting for current and forecasted climate conditions.  Pharmacists and patient care advocates are available for live conversations with patients 24 hours a day, seven days a week.  This mail-order service is a vital resource for Tennesseans, more than a third of whom (as noted) live in rural areas and may not have a brick-and-mortar pharmacy nearby.  Express Scripts Pharmacy has been licensed to operate in Tennessee since 1991 and has always been in good standing.

52.  Express Scripts Pharmacy's weather-resistant packaging and other capabilities also allow it to provide medications during emergencies.  And it has a track record of doing so.  For example, in 2017, it administered an emergency-prescription program for the Department of Health and Human Services in Puerto Rico following Hurricane Maria.  *See* Express Scripts, *Emergency Prescription Assistance Program (EPAP) due to Hurricane Maria in Puerto Rico* (Oct. 4, 2017), https://nj211.org/sites/default/files/documents/2017-10/expresscomm-epap-puertorico-oct2017.pdf.

53.  ESSDS is a nationally accredited specialty pharmacy that serves Tennesseans and others who suffer from complex sleep disorders.  Last year it dispensed more than 6,500 medications to nearly 800 Tennesseans.  Its dedicated staff consists of specially trained pharmacists, nurses, reimbursement specialists, and patient service coordinators.  ESSDS has been licensed to operate in Tennessee since 2000 and has always been in good standing.

54.  Freedom Fertility is a nationally accredited pharmacy and the nation's leading fertility pharmacy.  With over 30 years of experience supporting women's health and dispensing fertility medications, Freedom Fertility provides comprehensive expertise and resources to families pursuing IVF and other fertility treatments.  Freedom Fertility serves more than 800

14

Tennesseans, delivering over 9,000 prescriptions across the state in 2025. Freedom Fertility has been licensed to operate in Tennessee since 2000 (under the names Lynnfield Drug, Inc. and Lynnfield Compounding Center, Inc.) and has always been in good standing.

55. VFP was created through the merger of four nationally accredited pharmacies dedicated to supporting patients on the path to parenthood by providing accessible, affordable, and personalized fertility care. These pharmacies have decades of experience in the fertility industry and serve more than 3,200 Tennesseans, delivering over 12,000 prescriptions to Tennessee patients in 2025. VFP has been licensed to operate in Tennessee since 2018 (under the name Healy Pharmacy, LLC) and has always been in good standing.

56. EnGuide is a specialized home-delivery pharmacy focused on providing patients with GLP-1 medications. In 2025, EnGuide dispensed more than 16,000 prescriptions to over 8,000 patients in Tennessee. EnGuide has been licensed to operate in Tennessee since 2011 (under the name MAH Pharmacy, LLC) and has always been in good standing.

## III. ACCREDO HAS A SUBSTANTIAL PRESENCE IN TENNESSEE, SERVING HUNDREDS OF THOUSANDS OF PATIENTS FROM ITS MEMPHIS PHARMACY

57. Accredo, a nationally accredited specialty pharmacy, has a large pharmacy operation in Memphis that serves patients both nationwide and in Tennessee. This pharmacy holds pharmacy license credentials across 53 states and U.S. territories. In 2025, the pharmacy dispensed more than 2.3 million prescriptions to nearly half a million patients nationwide, including more than 128,000 prescriptions to nearly 26,000 patients in Tennessee. In 2025, the Memphis pharmacy had accuracy rates of 99.999899% for its front-end dispensing and 99.999264% for its fulfillment processing.

58. To serve its patients, Accredo (and related pharmacies) directly employ more than 1,200 people who work in pharmacy operations in Tennessee, including highly skilled

15

pharmacists, pharmacy technicians, and nurses. Its Memphis facilities span over 116,000 square feet and hold approximately $900 million in inventory on any given day.

59. Accredo's Memphis presence includes a Rare Disease Therapeutic Resource Center, dedicated to delivering personalized care to patients with rare diseases. This center supports 39 rare therapies, and in 2025, dispensed more than 150,000 prescriptions to more than 13,000 patients nationwide. Medicaid and Medicare patients each accounted for approximately a quarter of those served.

## IV. THE U.S. DEPARTMENT OF DEFENSE RELIES ON ESI-AFFILIATED PHARMACIES TO PROVIDE PHARMACY SERVICES TO MILITARY MEMBERS, RETIREES, AND THEIR FAMILIES THROUGH THE TRICARE PROGRAM

60. Under Title 10, Chapter 55 of the U.S. Code, the Department of Defense ("DoD") operates a healthcare program, known as TRICARE, through which it provides statutory healthcare entitlements to military servicemembers, retirees, and families. TRICARE offers healthcare benefits to approximately 9.4 million beneficiaries in all 50 states and overseas. Through TRICARE, beneficiaries can receive healthcare services at military treatment facilities ("MTFs"), such as DoD-operated hospitals and clinics, or via networks of participating civilian pharmacies. The Defense Health Agency ("DHA"), which administers TRICARE, contracts with several managed-care support organizations, a PBM, and a dental insurance organization to deliver healthcare entitlements.

61. As part of TRICARE, DoD must "establish an effective, efficient, [and] integrated pharmacy benefits program," which is known as the TRICARE Pharmacy Benefits Program. 10 U.S.C. §1074g(a)(1); *see also* 32 C.F.R. §199.21(a)(1). And by statute, this pharmacy program must satisfy a host of requirements. 10 U.S.C. §1074g. For example, it must make prescription drugs available to TRICARE beneficiaries through MTF pharmacies, a retail pharmacy network, and a national mail-order pharmacy program. *Id.* §1074g(a)(2)(E).

16

62. To administer TRICARE, DHA contracts with private, commercial health insurance and healthcare delivery companies. In awarding contracts, DoD must ensure that TRICARE "provide[s] a stable program of benefits," and it may award contracts only to "the offeror or offerors that will provide the best value to the United States to the maximum extent consistent with furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States." 10 U.S.C. §§1073(b), 1073a(a).

63. Pursuant to these authorities, DHA has contracted with ESI since 2003 for the delivery of pharmacy services to TRICARE beneficiaries. The current contract, known as TPharm5, requires ESI to perform a number of functions mandated by section 1074g. As relevant here, ESI must "establish and maintain a retail pharmacy network throughout the 50 United States" and must provide national mail-order pharmacy services to dispense and deliver medications to TRICARE beneficiaries. TPharm5 §C.3.3.1; *see also id.* at §§C.1, C.6.1.1; 10 U.S.C. §§1074g(a)(2)(E)(ii), (iii). The contract (excerpts of which are attached as Exhibit B) requires nationwide mail-order services to be provided through "the Contractor's Mail Order Pharmacy" and "the Contractor's mail order facilities." TPharm5 §§C.6.1, C.6.1.1.

64. ESI carries out its contractual obligation to provide national mail-order pharmacy services through Express Scripts Pharmacy, its in-house commercial mail-order pharmacy business. In this role, Express Scripts Pharmacy maintains a stock of medications on DoD's behalf and dispenses medications from that stock to fill orders by TRICARE beneficiaries. TPharm5 §C.6.1.

65. ESI informed DoD of its intent to use Express Scripts Pharmacy as TRICARE's mail-order pharmacy when ESI applied for the TRICARE contract. And when DoD awarded ESI the contract, it accepted Express Scripts Pharmacy as the "Contractor's Mail Order Pharmacy."

TPharm5 §C.6.1. DoD thus contemplated and understood Express Scripts Pharmacy's involvement when it granted the TRICARE contract to ESI in 2002.

66. Since then, Express Scripts Pharmacy has been a critical resource for TRICARE beneficiaries in Tennessee. In 2025, for example, nearly 45,000 Tennessean TRICARE beneficiaries received more than 734,000 prescriptions through Express Scripts Pharmacy. This mail-order service is especially important for beneficiaries living in rural areas, who would otherwise need to travel to an MTF or in-network retail pharmacy to acquire their medications. For TRICARE beneficiaries who have mobility limitations, that travel may be impractical or even impossible.

67. The TPharm5 contract also provides that the "TRICARE Mail Order Pharmacy … program … includes any network pharmacy designated by the Contractor and approved by the Government that can dispense specialty agents" by mail-order. TPharm5 §C.6.1. Accredo and Freedom Fertility have been "designated" by ESI and, as of March 1, 2024, "approved" by the government to dispense specialty agents by mail-order under this provision. The relevant excerpt of the contract modification designating Accredo and Freedom Fertility is attached as Exhibit C. In 2025, over 3,600 Tennessean TRICARE beneficiaries received nearly 19,000 medications from Accredo; of those, the Memphis pharmacy, in particular, dispensed over 15,000 medications to over 3,000 Tennessean TRICARE beneficiaries. And nationwide, the Memphis pharmacy dispensed over 186,000 medications to more than 41,000 TRICARE beneficiaries.

68. The TRICARE statute generally requires TRICARE beneficiaries "to refill non-generic prescription maintenance medications through military treatment facility pharmacies or the national mail-order pharmacy program." 10 U.S.C. §1074g(a)(9)(A). The TPharm5 contract requires ESI to carry out this requirement. *See* TPharm5 §C.6.6. The mail-order service is critical

because beneficiaries would otherwise need to travel to one of only two military pharmacies in the state to acquire these medications.

69. The TPharm5 contract further requires ESI to use a "replenishment model" for pharmaceutical supplies and drugs (both specialty and non-specialty). TPharm5 §§C.6.1, C.6.8. Under that model, the government does not pay ESI the cost of each pharmaceutical dispensed, or send ESI's pharmacies the pharmaceutical directly from the government's wholesale pharmaceutical distributor (referred to as the "National Prime Vendor" or "NPV"). Instead, ESI's pharmacies must dispense a prescription from their own, commercially acquired inventory, and then request "replenishment" of the same drug from the NPV. *Id.*

70. This model allows the government to realize significant savings. First, it allows the government to take advantage of government-specific pricing (laid out in a separately negotiated contract between the government and the NPV). These are significant discounts: The NPV "can obtain drugs at a fixed percentage discount off the lowest price otherwise available for each drug," "generally 24 percent less" than the retail average. *See* U.S. Government Accountability Office, GAO-25-107187, *Defense Health Care: DOD Should Improve Monitoring of TRICARE Beneficiaries' Access to Prescription Drugs* n.21 (2025) (citing 38 U.S.C. §8126(a)(2)). Second, ESI must request replenishment in "package sizes that are most economical to the Government," "rounded down to the nearest whole package size of product needed to replenish agents dispensed." TPharm5 §C.6.8.5. Those larger volumes allow the government to negotiate lower costs with the NPV. TPharm5 §§C.4.7, C.6.8, C.8.3, C.8.5. The government has praised the "benefit" of the "increased cost avoidance" of the replenishment model, calling out the "extremely favorable price" that the government has been able to negotiate for pharmaceuticals "in a very unforgiving acquisition environment." *Next Generation Pharmaceutical Contract*

*Provides Major Benefits for Military Customers*, Defense Logistics Agency (July 29, 2022), https://www.dla.mil/About-DLA/News/News-Article-View/Article/3109778/next-generation-pharmaceutical-contract-provides-major-benefits-for-military-cu.

71.     Copays for TRICARE members are established by Congress.  TRICARE members save money and pay lower copays for 90-day supplies of medications dispensed via mail-order.  For example, the cost-sharing amount for a 30-day supply of a retail generic will be $16 in 2027.  The cost-sharing amount for a 30-day supply of a retail brand will be $48.  In 2027, the cost-sharing amount for a 90-day supply of a mail-order generic will be $14 and the cost-sharing amount for a 90-day supply of a mail-order brand will be $44.  10 U.S.C. §1074g(a)(6)(A).

72.     The fact that Express Scripts Pharmacy, Accredo, and Freedom Fertility are ESI's affiliated pharmacies eliminates transaction costs and other inefficiencies that would otherwise exist in ESI's administration of mail-order pharmacy services for TRICARE beneficiaries.  DoD thus appropriately determined that the selection of Express Scripts Pharmacy, Accredo, and Freedom Fertility satisfies its statutory mandate to award contracts to contractors that will "provide the best value" to TRICARE beneficiaries and the government.  10 U.S.C. §1073a(a).

## V.     MEDICARE PART D RELIES ON ESI-AFFILIATED PHARMACIES TO PROVIDE PHARMACY SERVICES TO BENEFICIARIES

73.     Medicare is a federal health insurance program for people who are 65 or older, or who have certain disabilities or end-stage renal disease.  *See* 42 U.S.C. §1395 *et seq.*  Medicare Part D is the federal prescription-drug program that Congress created to provide Medicare beneficiaries with access to prescription medications through private plan sponsors operating under federal rules.  *See id.* §1395w-101 *et seq.*

74.     Part D is built on a market-based model:  Rather than administer the benefit itself, the federal government relies on private plans that compete to offer attractive coverage, "under

which marketplace competition ensures that enrollees receive low prices for prescription drugs." Medicare Program: Medicare Prescription Drug Benefit, 70 Fed. Reg. 4194, 4244 (2005).

75. Beneficiaries obtain Part D coverage from private plan sponsors in one of two ways. Those in traditional Medicare may enroll in a standalone Part D prescription-drug plan that supplements their traditional Medicare coverage. Beneficiaries who enroll in plans offered through Medicare Advantage (also known as Medicare Part C)—a private-plan alternative to traditional Medicare—may receive Part D coverage through a Medicare Advantage prescription-drug plan. No mechanism allows pharmacists to bill Medicare directly for Part D drugs; the benefit flows through the private sponsors in these programs. 42 U.S.C. §1395w-101(a)(1)(A).

76. The overwhelming majority of Part D sponsors contract with PBMs to administer pharmacy benefits. *See* U.S. Government Accountability Office, GAO-19-498, *Medicare Part D: Use of Pharmacy Benefit Managers and Efforts to Manage Drug Expenditures and Utilization* 14 (2019).

77. ESI provides PBM services to sponsors of Part D plans nationwide, including sponsors whose service areas include Tennessee. In conjunction with these services, ESI builds and maintains the Part D pharmacy networks that its sponsor clients use to serve Tennessee beneficiaries. Those networks include ESI's affiliated mail-order and specialty pharmacies, which plan sponsors select for their safety, convenience, reliability, and cost-effectiveness, and around which sponsors design the benefits they offer to Medicare enrollees in the state.

78. Express Scripts Pharmacy fills Part D prescriptions for Tennessee beneficiaries every day, shipping more than 591,000 prescriptions directly to the homes of nearly 37,000 Part D beneficiaries in Tennessee in 2025. For many Part D beneficiaries who are elderly, have limited

mobility, and/or live far from a brick-and-mortar pharmacy, Express Scripts Pharmacy is their primary means of obtaining medication.

79. Accredo dispensed more than 12,400 specialty prescriptions to nearly 2,000 Part D beneficiaries in Tennessee in 2025. In addition to many other medications, Accredo dispenses limited-distribution and exclusive-distribution therapies that are available through few or no other pharmacies, and it supports Part D beneficiaries managing complex and chronic conditions through specially trained pharmacists, nurses, and clinical staff. ESSDS and EnGuide also serve Part D beneficiaries in Tennessee.

80. Although Part D is a market-based benefits program, it remains subject to extensive regulatory oversight by the Centers for Medicare & Medicaid Services ("CMS"). Part D plans must provide convenient access to covered drugs, *see* 42 U.S.C. §1395w-104(b), and CMS has promulgated detailed network-access and network-adequacy standards governing how Part D sponsors deliver prescription-drug benefits, *see* 42 C.F.R. §423.1(b). Several of these standards expressly authorize or contemplate the integrated mail-order and specialty pharmacy arrangements through which ESI delivers services to Part D beneficiaries—and that the Act forbids.

81. Part D sponsors must admit "any willing pharmacy" that meets the sponsor's standard terms and conditions, 42 C.F.R. §423.120(a)(8)(i), including PBM-affiliated pharmacies.

82. Federal standards expressly authorize Part D sponsors to supplement their networks with "non-retail pharmacies, including pharmacies offering home delivery via mail-order." 42 C.F.R. §423.120(a)(3). Part D sponsors have relied on that flexibility to build mail-order options into their plan designs, and they have done so overwhelmingly through PBM-affiliated pharmacies.

83. Part D sponsors must provide convenient access to network pharmacies, measured (for non-mail-order pharmacies) by the share of beneficiaries living within a set distance of a network pharmacy. 42 U.S.C. §1395w-104(b)(1)(C)(i). For instance, at least 90% of Medicare beneficiaries in urban areas must live within two miles of a network retail pharmacy, at least 90% of beneficiaries in suburban areas must live within five miles of such a pharmacy, and at least 70% of beneficiaries in rural areas must live within fifteen miles of one. *See* 42 C.F.R. §423.120(a)(1). Sponsors overwhelmingly rely on PBMs to assemble and administer the pharmacy networks used to satisfy these access standards. *See* GAO-19-498, *supra* ¶76.

84. Federal law contemplates that Part D sponsors will serve enrollees through their own affiliated pharmacies. CMS waives the standard retail network access requirements for a Medicare Advantage organization that provides its enrollees with access to covered Part D drugs through pharmacies "owned and operated by" the organization, so long as the organization satisfies the Medicare Advantage network-adequacy standard instead. 42 C.F.R. §423.120(a)(7)(i); *see id.* §422.112. The organizations positioned to use that accommodation are typically the vertically integrated enterprises that include an insurer, a PBM, and affiliated pharmacies.

85. Federal law permits a Part D sponsor offering coverage other than defined standard coverage to "reduce copayments or coinsurance for covered Part D drugs obtained through a preferred pharmacy relative to the copayments or coinsurance applicable for such drugs when obtained through a non-preferred pharmacy." 42 C.F.R. §423.120(a)(9). This includes PBM-affiliated preferred pharmacies.

86. Federal law requires Part D sponsors to provide adequate access to "home-infusion" pharmacies, i.e., pharmacies that prepare and deliver intravenous or injectable medications for patients to take at home, and to ensure that those pharmacies meet stringent requirements for

23

clinically appropriate care. 42 C.F.R. §423.120(a)(4). PBM-affiliated companies rank among the largest home-infusion providers. For example, Optum Rx, a PBM that operates in Tennessee, is one of the two largest national providers of home-infusion therapy. *See Specialty Infusion Pharmacies 2026 Overview*, Access Market Intelligence (Feb. 20, 2026), https://tinyurl.com/yc87vh3u.

87. Congress reaffirmed the federal Part D framework just months before the Act's enactment. Effective with the 2028 plan year, the Consolidated Appropriations Act of 2026 imposes new requirements on PBMs that serve Part D sponsors, governing PBM compensation, transparency, reporting, audits, and federal oversight. Pub. L. No. 119-12, §§6223-6224 (Feb. 3, 2026).

## VI. HUNDREDS OF EMPLOYER-SPONSORED BENEFIT PLANS THAT PROVIDE PHARMACY COVERAGE IN TENNESSEE RELY ON ESI-AFFILIATED PHARMACIES

88. ESI provides PBM services to roughly 850 ERISA plan clients that offer prescription-drug coverage to nearly 900,000 individuals residing in Tennessee.

89. Employers design health plans to ensure access to medications and control costs (both for themselves and for beneficiaries), and many rely on ESI-affiliated pharmacies and the efficiencies of their integrated model. For example, many regional or national employers include PBM-affiliated pharmacies in their networks as part of uniform benefit offerings to employees across the country. And many employers design plans that require members to obtain costly specialty drugs from PBM-affiliated specialty pharmacies, like Accredo. Indeed, some of these drugs are available *only* from those PBM-affiliated pharmacies, due to manufacturers' limited- or exclusive-distribution arrangements.

24

## VII. THE ACT WILL BANISH MOST PBM-AFFILIATED PHARMACIES FROM TENNESSEE, WITH DEVASTATING EFFECTS ON PATIENTS, EMPLOYEES, AND PHARMACIES

90. The Act (previously Senate Bill 2040, or SB2040) was signed into law on May 22, 2026. It takes aim at PBM-affiliated pharmacies that serve tens of millions of patients nationwide—and millions in Tennessee alone—who depend on convenient and reliable access to affordable prescriptions.

91. If it takes full effect, the Act will prohibit nearly all PBM-affiliated pharmacies from operating in Tennessee.

92. The Act provides that, starting on July 1, 2028, a "person or entity shall not" "[d]irectly or indirectly own, operate, control, or direct the operation of, the whole or any part of a pharmacy" and also "[d]irectly or indirectly own, operate, control, or direct the operation of, the whole or any part of" a "health insurance issuer" and a "pharmacy benefits manager." SB2040 §2(b), to be codified in Tennessee Code Title 63, Chapter 10, Part 3. This prohibition applies where the ownership interest is greater than five percent. *Id.* §2(c).

93. A pharmacy covered by the Act may operate in Tennessee through December 31, 2028, if it "demonstrates to the [B]oard that it is actively pursuing a bona fide sale to an unaffiliated entity." SB2040 §2(e). The Board may also grant an additional six-month extension "upon proof of substantial progress toward completion of such sale." *Id.*

94. The Board is authorized to promulgate rules to effectuate the Act, SB2040 §3, and shall refer potential violations to the Tennessee Attorney General, *id.* §2(f)(2), who is authorized to enforce the law, *id.* §2(f)(1). Pharmacies found to be in violation of the law are "subject to a civil penalty of up to ten thousand dollars" per violation, per day. *Id.* §2(f)(3).

95. The Act expressly carves out certain types of pharmacies. First, a hospital or health-system pharmacy is not considered a PBM for purposes of the law. SB2040 §2(d)(1).

Second, the law applies only to entities that own or control a pharmacy, a PBM, *and* a health insurance issuer. *Id.* §2(b)(1), (2). As the state legislature recognized, nearly all PBMs with affiliated pharmacies are also affiliated with a health insurance issuer. *See* Tennessee General Assembly Fiscal Review Committee, Fiscal Memorandum on SB2040-HB1959, at 3 (Apr. 7, 2026). But RxPreferred Benefits, the only Tennessee-based PBM, is not; it is owned and operated by independent pharmacies.

96. The Act also contains exceptions for particular drugs and services. For example, the law "does not apply to an FDA-designated orphan drug with limited distribution, or to a drug that is subject to an FDA-required risk evaluation and mitigation strategy (REMS) that includes limited distribution." SB2040 §2(d)(3). It likewise "does not prohibit an employer from owning or operating a pharmacy or administering pharmacy benefits solely for its own employees, retirees, and dependents under an employee benefit plan." *Id.* §2(i). And it "does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program by the department of defense, department of veterans affairs, Indian health service, or office of personnel management." *Id.* §2(j). But the Act does not exempt the *entities* that provide such services, meaning that this exception only protects pharmacies that *exclusively* provide services pursuant to government contracts.

97. The practical effects of the Act will be catastrophic for both patients and pharmacists across Tennessee and nationwide.

98. For starters, the law will force hundreds of pharmacies to shutter or relocate to another state—including Accredo's Memphis location—putting many Tennesseans out of work.

99. The closure of hundreds of pharmacies across the state will also force patients and their families, including seniors, to change their pharmacies, possibly requiring them to trek across

26

their town or county to fill prescriptions. And it will create mass confusion among Tennesseans who need prescription medications to sustain their health, and break important bonds between patients and their pharmacists.

100. The Act will not only shutter brick-and-mortar pharmacies, but also prohibit critical mail-order services. As discussed, the mail-order services ESI-affiliated pharmacies provide are a vital resource for Tennesseans—more than a third of whom live in rural areas and thus lack easy access to brick-and-mortar pharmacies. Without Express Scripts Pharmacy, Accredo, ESSDS, and EnGuide, Tennesseans with complex and chronic conditions are likely to face dangerous changes to their care, losing the pharmacists they trust as well as the nurses with experience visiting their homes to administer treatment. And without Freedom Fertility and VFP, hundreds of individuals trying to build their families are likely to have fertility treatments disrupted, which could lead to failed treatment.

101. As discussed, the Act will force Accredo to shut down or relocate its Memphis pharmacy to another state, cutting off a major source of specialty drugs for patients nationwide and within Tennessee—including patients served by TRICARE, Medicare Part D, and ERISA plans.

102. In addition to requiring the closure of Accredo's Memphis pharmacy, the Act will more broadly impede ESI's affiliated pharmacies from providing vital mail-order and specialty pharmacy services to military servicemembers, retirees, and families in the state through the TRICARE program. While the Act by its terms "does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program by the department of defense," SB2040 §2(j), this purported carveout would only exempt PBM-affiliated pharmacies that *exclusively* serve TRICARE beneficiaries—not

pharmacies like Express Scripts Pharmacy, Accredo, and Freedom Fertility, which provide most of their pharmacy services to patients who are not TRICARE beneficiaries. The TRICARE contract presupposes the existence of these pharmacies' robust, nationwide commercial operations. And it leverages them by requiring the pharmacies to maintain inventory from their commercial business to dispense mail-order and specialty prescriptions to TRICARE beneficiaries, and then receive payment in the form of "replenishment" of that inventory from the federal government's wholesale pharmaceutical distributor. Additionally, the business models of ESI's pharmacies depend on serving non-TRICARE patients along with TRICARE patients; they cannot feasibly serve TRICARE beneficiaries exclusively. At a minimum, any attempt to do so would drastically increase costs to the government, which is an obstacle to achieving Congress's mandate that TRICARE operate at the lowest possible cost without sacrificing quality. And that would be all the more true if other states, perhaps every state, enacted a similar law (which as noted is the proper frame of analysis for preemption, *see, e.g.*, *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001)). Put simply, allowing Tennessee (and hence every other state in the country) to constrict ESI's affiliated pharmacies to providing pharmacy services exclusively to TRICARE beneficiaries would thus make those pharmacies unable to serve those very beneficiaries in accordance with the TRICARE contract—jeopardizing these patients' access to care.

## VIII. THE ACT'S PURPOSE AND EFFECT ARE TO PROTECT LOCALLY OWNED PHARMACIES FROM OUT-OF-STATE COMPETITION

103. The text of the Act, the circumstances of its enactment, and the statements of the legislators and advocates who secured its passage all confirm a single purpose and effect: to protect locally owned Tennessee pharmacies from having to compete with out-of-state entities.

104. To start, the Act's preamble makes plain the law's purpose to "protect[] rural and community pharmacy access." It invokes the role of pharmacists "preserved through competitive and independent pharmacy access," and it recites the importance of "preserving pharmacy access, particularly in rural and medically underserved areas." The recurring touchstones of the preamble—"independent," "community," "rural," and "local" pharmacy access, set against "PBM-owned entities"—identify both the in-state interests the Act was written to protect and the out-of-state enterprises it was written to displace.

105. The Act's ownership trigger likewise applies almost exclusively to large, vertically integrated companies based outside Tennessee. It leaves untouched the pharmacies that operate without a commonly owned PBM and insurer—including Tennessee's independent and community pharmacies—which the statute's sponsors expect to absorb the business lost by the integrated enterprises. The prohibition instead reaches the vertically integrated organizations that combine a pharmacy, a PBM, and a health insurer under common ownership. Each such enterprise is headquartered outside Tennessee: The Cigna Group is headquartered in Connecticut, CVS Health in Rhode Island, UnitedHealth Group in Minnesota, and the other integrated organizations subject to the law—including Elevance Health and Humana, for example—in other locations outside Tennessee. The Act thus operates against out-of-state enterprises and burdens interstate commerce while preserving, and indeed expanding, the market position of in-state pharmacies.

106. The Act's scope confirms that the legislature drew the line to advantage local interests at the expense of out-of-state enterprises. To start, the Act excludes hospital and health-system pharmacies from the definition of a PBM, so that a Tennessee hospital system may integrate insurance, benefit administration, and pharmacy operations in much the same manner the regulated enterprises do, free of the prohibition. SB2040 §2(d)(1). And the Act expressly preserves the

freedom of "independently owned or unaffiliated pharmacies to provide mail-order, specialty, or delivery services directly to patients." *Id.* §2(d)(2). The entities left to bear the prohibition are the out-of-state integrated enterprises; the interests left free are Tennessee's hospital systems, employers, and independent and community pharmacies.

107. Indeed, the Act is drawn so carefully that it reaches every PBM operating in Tennessee *except* for the only one based in the state. Specifically, the Act's ownership provision, as noted, reaches only enterprises that pair a pharmacy with both a PBM and a health insurance issuer. SB2040 §2(b)(2). While most PBMs have such an insurer affiliation, *see* Fiscal Memorandum, SB2040-HB1959 at 3 (Apr. 7, 2026), the sole Tennessee-based PBM does not: RxPreferred Benefits is instead owned and operated by independent pharmacies. Thus, the practical effect of the health insurance issuer requirement is to remove the one in-state PBM from the law's reach.

108. Legislative history confirms that conclusion. As introduced, SB2040 barred any PBM from acquiring, holding, or controlling "any ownership or beneficial interest in" a pharmacy license or pharmacy license holder. *See* SB2040, 114th General Assembly, Regular Session, at §2 (Tenn. 2026) (as introduced). This language would have swept in RxPreferred Benefits along with its out-of-state competitors. But the Tennessee Pharmacists Association stated soon thereafter that it had "been working with the bill sponsors to provide amendatory language to meet the needs of additional stakeholders, which [it] expect[ed] to be available soon." Tennessee Pharmacists Association, *2026 Legislative Updates* (Feb. 17, 2026), https://tinyurl.com/5xbfdbaa. And within a week, the bill was narrowed to reach only enterprises that own or control a pharmacy as well as *both* a PBM and a health insurance issuer, carving out RxPreferred Benefits.

109.     That the Act leaves *some* national pharmacy chains (those not affiliated with PBMs and insurers) free to operate as pharmacies does not eliminate its discriminatory effect.  The dormant Commerce Clause protects against laws that burden interstate commerce by shifting business from out-of-state competitors to in-state interests.  The Act does exactly that:  It strips vertically integrated enterprises of their Tennessee pharmacy business and channels it, as the state's own fiscal analysis predicted, to the independent and community pharmacies positioned to replace them.

110.     Statements by the Act's principal proponents confirm that intended effect.  Senator Bobby Harshbarger—the Act's lead Senate sponsor and the manager of his family's own independent community pharmacy—explained that PBMs had been "allowed to own or control pharmacies while also deciding which pharmacies patients can choose," and that this alleged conflict of interest "leads to … local pharmacies being squeezed out."  Bobby Harshbarger for TN Senate District 4, Facebook (Feb. 26, 2026), https://tinyurl.com/3kf38mkd.  He later celebrated the bill's passage as a measure to restore fairness to a system "stacked against independent pharmacies for far too long" and to ensure that "Tennessee pharmacies have a fair chance to compete."  Bobby Harshbarger for TN Senate District 4, Facebook (Apr. 20, 2026), https://tinyurl.com/5n9bmmbc.

111.     Other legislators sounded similar protectionist themes.  House Speaker Cameron Sexton, for example, urged support for the bill because it would "protect independent pharmacies in [their] community" and "keep independents in business."  Robert Schmad, *Tennessee Lawmakers Push Bill That Could Make Them, and Their Donors, Richer by Triggering CVS Closures*, Washington Examiner (Mar. 10, 2026), https://tinyurl.com/yk4fby39.  Representative Monty Fritts similarly called the bill a "good way to stand up for our small independent

31

pharmacies." House Floor Session, 63rd Legislative Day, at 1:27:30-1:27:52 (Tenn. Apr. 21, 2026), https://tinyurl.com/2jnk7xx3. Representative Robert Stevens was even more direct, acknowledging on the House floor that the legislation is targeted at "out of state compan[ies]" and that "the crux of [the] legislation" is "to protect local pharmacies and punish the big ones." *Id.* at 1:28:51-1:29:05. And Representative Sabi "Doc" Kumar viewed the Act as a measure to ensure independent pharmacies are "being properly compensated," explaining that it would "restore" the "balance" that existed before a "number of neighborhood and independent pharmacies" in Tennessee closed. Hearing on HB1959 Before the H. Ins. Comm., 114th Gen. Assemb., at 28:35-29:20 (Tenn. Mar. 10, 2026), https://tinyurl.com/3e2ssphb. Finally, Senator Ken Yager urged his colleagues to "vote for independent pharmacies." Senate Floor Session, 57th Legislative Day, Apr. 20, 2026, at 1:28:19-1:28:37, https://tinyurl.com/ykuc5dms. These statements leave no doubt that the Act was designed to take business from vertically integrated out-of-state enterprises and redirect it to local pharmacies.

112. Independent Tennessee pharmacies and the pharmacists' associations that represent them also garnered support for the bill by framing it as a measure to protect local pharmacies from their out-of-state competitors. One independent Tennessee pharmacist, for example, explained that PBMs "direct patients to their own pharmacies," and suggested SB2040 would help support local pharmacies. *Fair RX Act Supporting Local Pharmacies Heads to Governor's Desk*, WBBJ-TV (Apr. 21, 2026), https://tinyurl.com/3hve5zey. Likewise, the CEO of the Tennessee Pharmacists Association claimed that PBMs were the "judge, jury and executioner" of "local, independent pharmac[ies]." Kim Jarrett, *Both Sides of Pharmacy Bill Raise Alarms for Consumers*, Center Square (Mar. 30, 2026), https://tinyurl.com/yc2h4pky.

113. To the extent the Act purports to address conflicts of interest—patient steering toward affiliated pharmacies or higher reimbursements for affiliated pharmacies than for independent ones—that purpose is pretextual. Tennessee law already prohibits such conduct several times over, through targeted measures that leave the integrated business model intact. And, on information and belief, independent pharmacies in Tennessee have grown their market share over the past five years. The state therefore had no need to ban PBM-affiliated pharmacies from Tennessee to address the conflicts of interest it alleged.

114. To begin with, Tennessee has regulated PBMs comprehensively for years. For example, Tennessee law forbids a PBM or insurer from interfering with an insured's right to obtain prescriptions from the contracted pharmacy of the patient's choice, and it bars penalizing a patient for that choice. Tenn. Code Ann. §56-7-3120. Tennessee likewise prohibits both spread pricing (i.e., billing a health plan more for a drug than the PBM pays the dispensing pharmacy) and below-cost reimbursement (i.e., paying a pharmacy less than its own acquisition cost for the drug), and it regulates the charges and reimbursements a PBM may impose. *Id.* §56-7-3206. Tennessee also forbids discrimination against pharmacies that participate in the federal 340B Drug Pricing Program, which requires drug manufacturers to sell certain outpatient drugs at discounts to safety-net providers such as community health centers and hospitals serving low-income patients. *Id.* §56-7-3119. And it separately regulates PBM audits, retroactive fees, gag clauses, and prompt payment of pharmacy claims. *Id.* §§56-7-3108, -3109, -3116, -3119. Finally, Tennessee law specifically forbids the favoritism the Act invokes, prohibiting a PBM from engaging in a pattern or practice of reimbursing Tennessee pharmacies less than it reimburses an affiliated pharmacy for the same drug, product, or service. *Id.* §56-7-3118(d).

115. The legislative record discloses no reason why this existing framework was inadequate to address any of the conflicts of interest invoked to justify the Act. The record contains no finding that PBMs were violating Tennessee's existing laws, no finding that those laws had failed to address the conduct they prohibit, and no finding that the targeted remedies the General Assembly had already enacted—reimbursement parity, anti-steering, any-willing-pharmacy, and the rest—were insufficient and could be cured only by banishing vertically integrated enterprises from Tennessee altogether.

116. Tennessee's own analysis confirms that the Act's professed benefits are illusory. A law defended as a measure to lower costs and protect patient access cannot be squared with a legislative record showing that the law will significantly raise costs and disrupt access—and the Act's record shows exactly that. Testifying before the Senate Finance, Ways and Means Committee, the Commissioner of the Department of Finance and Administration estimated that the Act would increase expenditures for state-administered benefit plans by about $29.1 million annually. Hearing on SB2040 Before the Senate Finance, Ways & Means Committee, 114th General Assembly (Tenn. Mar. 17, 2026) (statement of Jim Bryson). The director of the state's Medicaid program, TennCare, likewise predicted that the Act will raise costs: Specialty drugs will cost the state approximately 16% more as a result of the Act, with a fiscal impact to the state's Medicaid and employee benefit programs of up to $24 million. *See* Kim Jarrett, *Senate Committee Explores State Impact of Pharmacy Bill*, Center Square (Mar. 17, 2026), https://tinyurl.com/ybap8znb.

117. The burdens the Act imposes on interstate commerce are also substantial. By forcing the regulated enterprises to divest or restructure their integrated pharmacy operations, the Act will disrupt national mail-order networks, fracture the limited- and exclusive-distribution

34

networks that manufacturers rely on to deliver high-cost specialty therapies under tightly controlled clinical and supply chain protocols, and raise prescription-drug prices nationwide by eliminating efficiencies. Multistate plan sponsors and PBMs, moreover, will have to redesign their pharmacy networks around a Tennessee-specific ownership rule.

118. In sum, the text of the Act, the circumstances of its enactment, the statements of its sponsors and supporters, and the state's own fiscal analysis all establish that the Act's purpose and effect are to protect locally owned Tennessee pharmacies from out-of-state competition by forcing vertically integrated national enterprises to surrender their Tennessee pharmacy operations. The problems the Act purports to solve are already addressed by existing Tennessee law, and the affordability and access the Act promises are contradicted by the state's own findings. What remains is economic protectionism—the displacement of out-of-state competitors for the benefit of in-state interests—at the expense of patients.

## IX. THE ACT WILL IRREPARABLY HARM PLAINTIFFS

119. Defendants' enforcement of the Act will cause Plaintiffs irreparable harm.

120. To start, the Act will cause an enormous and unrecoverable loss of business and goodwill. Hundreds of thousands of Tennessee patients rely on ESI-affiliated pharmacies to fill their prescriptions, including patients with complex and chronic conditions who depend on Accredo's pharmacists, nurses, and clinical staff, and patients who receive maintenance medications by mail from Express Scripts Pharmacy. The Act will sever the relationships that Plaintiffs and their pharmacists, nurses, and care teams have built with these patients and their medical providers over many years.

121. Those relationships, once broken, likely cannot be restored. Patients forced to transfer to substitute pharmacies—and, for many specialty patients, to assemble their care from multiple sources where a single source served them before—will settle into those new

35

arrangements.  The burden and disruption of switching pharmacies a second time will mean that many patients never return to Plaintiffs' pharmacies, even if those pharmacies can later serve them again.  The loss of patient trust, loyalty, and competitive position that the Act will inflict is irreparable harm.  *Southern Glazer's Distributors of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 852 (6th Cir. 2017).

122.    The Act will also inflict an enormous loss of sales and market share on Plaintiffs. By design, the Act will compel Plaintiffs to surrender their Tennessee pharmacy business to competitors, and the General Assembly's own fiscal analysis predicted that independent pharmacies will enter the market to replace the pharmacies the Act forces out.  Government action that creates "a realistic prospect of lost sales and market share" can thus support a finding of irreparable harm, because such losses are difficult to quantify and difficult to reverse once they occur.  *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015).

123.    The injury will extend far beyond Tennessee's borders.  The Act will require Plaintiffs to end their Tennessee relationships, creating uncertainty among patients, prescribing providers, plan sponsors, and drug manufacturers nationwide, and damaging Plaintiffs' reputation and their ability to serve patients throughout the country.  And it will imperil ESI's relationships not only with multistate plan sponsors, which will be forced to choose between managing a Tennessee-specific carveout and moving their entire book of business to a different PBM, but also with manufacturers of limited- and exclusive-distribution drugs, which will face the same costly dilemma as a result of the Act.

124.    The Act will further force Plaintiffs to incur substantial costs that they likely cannot recover.  Because the state is immune from suit for money damages, the cost of complying with the Act is itself irreparable harm.  *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

36

125. Those costs include the expense of winding down or transitioning Tennessee operations—transitioning patients, issuing the required notifications, and coordinating with prescribing providers—and the expense of shutting down or relocating Accredo's specialty pharmacy operations out of Tennessee, including surrendering Accredo's Tennessee pharmacy license, obtaining licensure in another state, moving the Memphis facility's equipment and inventory to another state, standing up a new facility, and hiring and training a new workforce to replace Tennessee-based employees who cannot or will not relocate. Plaintiffs estimate that replacing the capacity of the Memphis pharmacy by relocating to another state will take approximately 18 months and cost roughly $113 million. And decommissioning the Memphis facility, once it has ceased business operations, will take approximately 16 weeks.

126. In addition, the Act will require Plaintiffs to incur the costs of renegotiating or restructuring contracts with plan sponsors and drug manufacturers to account for ESI's inability to serve Tennessee through its affiliated pharmacies, and to retain counsel and consultants to manage the transition and assess the Act's divestiture and cross-state compliance obligations. ESI has already begun incurring such costs, including staff time devoted to contingency planning, legal analysis, and communications with affected patients and partners.

127. The harm the Act threatens is imminent. It is now law, and Plaintiffs will need to begin the lengthy process of winding down or relocating their Tennessee operations in the next six months in order to ensure that they can transition patients safely in advance of the Act's deadline. SB2040 §2(b). The threat that the state will enforce the Act so as to compel Plaintiffs to cease operating in Tennessee, in whole or in part, establishes irreparable harm well before any enforcement action is taken.

## COUNT ONE
### (Dormant Commerce Clause, U.S. Const. art. I, §8; 42 U.S.C. §1983)

128. Plaintiffs incorporate and re-allege paragraphs 1 through 127 as if fully set forth herein.

129. The Commerce Clause vests Congress with power to "regulate Commerce … among the several States." U.S. Const. art. I, §8, cl. 3. Within the Commerce Clause, the Supreme Court has recognized a "dormant Commerce Clause," which "state laws offend … when they seek to 'build up domestic commerce' through 'burdens upon the industry and business of other States,' regardless of whether Congress has spoken." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quoting *Guy v. City of Baltimore*, 100 U.S. 434, 443 (1879)).

130. A state thus violates the dormant Commerce Clause when it "discriminat[es] against interstate commerce." *Northwest Airlines, Inc. v. County of Kent*, 510 U.S. 355, 373 n.18 (1994). Indeed, this "antidiscrimination principle lies at the 'very core' of [the Supreme Court's] dormant Commerce Clause jurisprudence." *National Pork*, 598 U.S. at 369. Specifically, "the Commerce Clause prohibits the enforcement of state laws 'driven by economic protectionism— that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors.'" *Id.* (quoting *Department of Revenue of Kentucky v. Davis*, 553 U.S. 328, 337-338 (2008)).

131. The Act violates the dormant Commerce Clause because it discriminates against out-of-state commerce in order to benefit in-state economic interests. As the text and legislative history demonstrate, the law was designed to protect locally owned Tennessee pharmacies from competition by large, vertically integrated enterprises that operate across state lines. And the burden of the Act falls on out-of-state commerce. Although the to-be-banished entities operate

38

pharmacies in Tennessee, they are each controlled by a parent company headquartered outside the state.

132. Independently, the Act violates the dormant Commerce Clause because the burden it imposes on interstate commerce is clearly excessive in relation to its putative local benefits. *See Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The law imposes substantial burdens on interstate commerce: It compels integrated interstate enterprises to divest or relocate their Tennessee pharmacy operations, disrupts the nationwide mail-order and specialty pharmacy networks through which those enterprises serve patients in every state, interferes with the limited- and exclusive-distribution network arrangements manufacturers choose for high-cost specialty therapies, and forces multistate plan sponsors and PBMs to redesign their pharmacy networks around a Tennessee-specific ownership rule.

133. The law's putative local benefits, by contrast, are speculative and outweighed by the costs the Act imposes on the state itself. And the conflicts of interest that the law purports to solve are already addressed by existing Tennessee law, rendering pretextual any claim that they are the Act's true purpose.

**COUNT TWO**
**(TRICARE Preemption, U.S. Const. art. VI, cl. 2; 10 U.S.C. §1103; 32 C.F.R. §199.17)**

134. Plaintiffs incorporate and re-allege paragraphs 1 through 127 as if fully set forth herein.

135. The U.S. Constitution's Supremacy Clause states: "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof … shall be the supreme Law of the Land … any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

39

136. Under the Supremacy Clause, "state law is preempted" whenever "federal law 'imposes restrictions or confers rights on private actors' and 'a state law confers rights or imposes restrictions that conflict with the federal law.'" *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (quoting *Murphy v. National Collegiate Athletic Association*, 584 U.S. 453, 477 (2018)).

137. Pursuant to the Supremacy Clause and federal statute, ESI's contract with the federal government to manage DoD's TRICARE Pharmacy Benefits Program preempts the application of the Act to ESI, Accredo, Express Scripts Pharmacy, and Freedom Fertility.

138. Indeed, TRICARE's enabling statute includes a preemption provision that expressly exempts its contractors from state laws and regulations. Specifically, the federal statute provides that state laws or regulations "relating to … health care delivery … shall not apply to any [TRICARE] contract" if the Secretary of Defense determines that (1) the state laws or regulations are "inconsistent with a specific provision of the contract or a regulation promulgated" to administer TRICARE, or (2) preemption is "necessary to implement or administer the provisions of the contract or to achieve any other important federal interest." 10 U.S.C. §1103(a). Exercising this authority, the Secretary has "determined that" it is necessary to preempt "any State or local law relating to … health care delivery," and thus such laws "do[] not apply in connection with TRICARE." 32 C.F.R. §199.17(a)(7)(i)-(ii). Other federal regulations similarly provide that state laws and regulations "relating to … health care delivery" "do[] not apply in connection with TRICARE pharmacy contracts." *Id.* §199.21(o)(2).

139. These provisions of federal law preempt the Act because it "relat[es] to … health care delivery" and interferes with mail-order services that ESI is obligated to provide to TRICARE beneficiaries. ESI's TRICARE contract requires it to fill prescriptions by mail for military servicemembers nationwide, using "the Contractor's Mail Order Pharmacy" and "the Contractor's

40

mail order facilities," TPharm5 §§C.6.1, 6.1.1—that is, Express Scripts Pharmacy, Accredo, and Freedom Fertility. Even though the Act states that it "does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program by the department of defense [or] department of veterans affairs," SB2040 §2(j), this purported carveout only exempts PBM-affiliated pharmacies that *exclusively* serve TRICARE beneficiaries. Hence, Plaintiffs will be prohibited from operating in Tennessee if they provide pharmacy services to any non-TRICARE patients. Accredo, Express Scripts Pharmacy, and Freedom Fertility provide *the bulk* of their pharmacy services to patients who are not TRICARE beneficiaries. Indeed, as discussed, the TRICARE contract presupposes the existence of the commercial arm of these pharmacies' business, and it leverages that arm: Under the replenishment model, a mail-order pharmacy must acquire inventory commercially. TPharm5 §§C.6.1, C.6.8. Then, after it dispenses drugs to TRICARE beneficiaries, the pharmacy requests replenishment from the government, which sends drugs in the most economical package size. *Id.* §C.6.8.5. The pharmacy then has the contractual duty to "maximize" the extra replenishment by dispensing that inventory to commercial clients as well as other TRICARE beneficiaries. *Id.* §C.4.7. Without access to the commercial market, the replenishment model cannot properly function, and the government will not be able to realize its anticipated savings.

140. The business models of Express Scripts Pharmacy, Accredo, and Freedom Fertility depend on serving non-TRICARE patients alongside TRICARE patients; it is not feasible for them to provide TRICARE services exclusively. At a minimum, any attempt to do so would drastically increase costs to the government, undermining the cost-minimizing mandate in the TRICARE statute, regulations, and contract. Thus, allowing Tennessee (and hence every other state in the country) to limit Accredo, Express Scripts Pharmacy, and Freedom Fertility to exclusively serving

TRICARE beneficiaries effectively prevents them from operating at all—rendering them unable to serve TRICARE beneficiaries.

141.     By forcing Accredo's Memphis facility—which spans over 116,000 square feet, holds approximately $900 million worth of drug products on any given day, and serves nearly 500,000 patients nationwide—to shut down (or become TRICARE-exclusive, which again, is neither consistent with the TRICARE contract nor feasible), the Act (again) impedes Accredo's ability to provide specialty pharmacy services to TRICARE beneficiaries within Tennessee, along with out-of-state TRICARE beneficiaries served by the Memphis pharmacy.

142.     Even if ESI's affiliated pharmacies could theoretically carry out ESI's obligation to provide mail-order and specialty pharmacy services to Tennessee's TRICARE beneficiaries by relying exclusively on their commercial inventory and business operations in other states (which Plaintiffs dispute), that is irrelevant to whether the Act is preempted.  If Tennessee may lawfully banish PBM-affiliated pharmacies, so may any other state in the country.  For example, the Supreme Court has held a single state's tort law implicitly preempted because "complying with [federal law's] detailed regulatory regime in the shadow of 50 States' tort regimes will dramatically increase the burdens facing potential applicants."  *Buckman*, 531 U.S. at 350; *cf. Healy v. Beer Institute, Inc.*, 491 U.S. 324 (1989), where the Supreme Court, considering a Commerce Clause challenge, said that "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering how the challenged statute may interact with the legitimate regulatory regimes of other States and what effect would arise if not one, but many or every, State adopted similar legislation," *id*. at 336.

143.     Likewise, the Sixth Circuit has held that ERISA preempted certain state-law causes of action because "Congress contemplated that ERISA's fiduciary duties would be replaced by the

contractual duties set forth in these plans—not by the fiduciary-duty rules from all 50 States." *Aldridge v. Regions Bank*, 144 F.4th 828, 842-843 (6th Cir. 2025).

144. And if every state in the country adopted a law similar to the Act, there would be no out-of-state commercial inventory or business to sustain ESI's affiliated pharmacies' TRICARE services in Tennessee (or anywhere else).

145. Moreover, ESI cannot replace these mail-order pharmacies with other, non-ESI affiliated pharmacies while honoring its obligations under the TPharm5 contract. While TPharm5 does not require ESI to use an affiliated specialty pharmacy, using non-affiliated pharmacies would significantly raise costs. ESI would need to charge higher administrative and dispensing fees to account for the risk of an independent pharmacy's potential breach, along with monitoring costs. Those increased costs, which would invariably be passed along to the government, are contrary to the purposes of the TRICARE statute, which requires its contractor to "provide the best value to the United States." 10 U.S.C. §1073a(a).

146. Preventing Accredo, Express Scripts Pharmacy, and Freedom Fertility from serving as TRICARE's mail-order pharmacies would be impractical, as those pharmacies maintain and dispense a nationwide stock of medications on behalf of DoD. It would also increase costs for the TRICARE pharmacy program, since those pharmacies' status as ESI's in-house pharmacies eliminates transaction costs and other inefficiencies, enabling them to "provide the best value to the United States," 10 U.S.C. §1073a(a), in the administration of the TRICARE program. And it would undermine the uniformity of the TRICARE program—which requires DoD to establish a "*national* mail-order pharmacy program," *id.* §1074g(a)(2)(E)(iii)—interfering with DoD's obligation to ensure nationwide consistency in the provision of health benefits to military personnel.

147. Because the Act is preempted by federal law, the Supremacy Clause prohibits Defendants from enforcing it against Plaintiffs. Accordingly, Plaintiffs are entitled to a declaration that the Act is preempted to the extent its application would prevent ESI, Accredo, Express Scripts Pharmacy, or Freedom Fertility from carrying out their functions as part of the federal TRICARE program, along with an injunction against such application.

**COUNT THREE**
**(Medicare Part D Preemption, U.S. Const. art. VI, cl. 2;**
**42 U.S.C. §§1395w-26(b)(3), -112(g), -104(b)(1)(C))**

148. Plaintiffs incorporate and re-allege paragraphs 1 through 127 as if fully set forth herein.

149. Congress made Part D preemption track the preemption rule that applies to Medicare Advantage plans under Part C. Specifically, Congress specified that the Part C preemption provision applies to prescription-drug plan sponsors and Part D prescription-drug plans "in the same manner" that it applies to Medicare Advantage organizations and plans. 42 U.S.C. §1395w-112(g). The Part C provision states, in turn, that federal standards "shall supersede any State law or regulation," except for State licensing laws and State laws relating to plan solvency. *Id.* §1395w-26(b)(3). The result is that federal Part D standards preempt state laws addressing the same subjects.

150. A state law operates "with respect to" the federal standards—and is therefore superseded—when it regulates the same subject matter as a federal Part D standard or frustrates the purpose of one. *Pharmaceutical Care Management Association v. Wehbi*, 18 F.4th 956, 971-972 (8th Cir. 2021).

151. Pursuant to its authority under Part D, CMS has established a detailed set of standards governing how Part D sponsors deliver prescription-drug benefits, including standards addressing network adequacy, beneficiary access, preferred-pharmacy arrangements, and mail-

44

order and specialty pharmacy delivery.  *See* 42 U.S.C. §1395w-104; 42 C.F.R. §§423.120, 423.124.  Those standards afford Part D sponsors and their PBMs flexibility to design pharmacy networks, structure preferred-pharmacy arrangements, use mail-order and specialty pharmacy services, and delegate network functions.  42 U.S.C. §1395w-104; 42 C.F.R. §§423.120(a), (b).  They authorize—and in places affirmatively protect—the integrated mail-order and specialty pharmacy arrangements through which ESI and its affiliated pharmacies serve Tennessean Part D beneficiaries.

152.  The Act regulates the same subject matter as those standards and frustrates their purpose.  By prohibiting any enterprise from holding more than a five-percent interest in, or otherwise controlling, a Tennessee pharmacy while also owning or controlling both a PBM and a health insurance issuer, the Act prohibits vertical integration and thereby restricts which pharmacies a Part D plan may use in its network—the very subject the federal standards govern.  Put simply, the law impermissibly substitutes Tennessee's judgment for the decisions of Congress and CMS about appropriate network design.

153.  The Act also frustrates Congress's purpose of making Part D a federal program governed by federal rules rather than a patchwork of state-by-state pharmacy mandates.  As noted, Part D incorporates Medicare Advantage's preemption rule.  Congress made that rule broad because it intended Medicare Advantage to function as a "federal program operated under Federal rules," in which state laws generally "should not apply" except where they concern traditional state oversight, such as licensing and plan solvency.  *See* House Conference Report No. 108-391, at 557.

154.  Part D's own preemption clause—which is "sweeping" and "akin to field preemption," *Pharmaceutical Care Management Association v. Mulready*, 78 F.4th 1183, 1208-

45

1212 (10th Cir. 2023)—serves the same end: ensuring that the program operates for the most part under uniform federal standards rather than divergent state mandates.

155. The Act is exactly the kind of law that preemption clause exists to displace. By barring PBM-affiliated pharmacies from operating in Tennessee under their current ownership structure, the Act prevents Part D sponsors from using in Tennessee the same integrated PBM-affiliated pharmacy networks they use elsewhere. Sponsors must therefore either redesign their networks more broadly to remove those affiliated pharmacies or create a Tennessee-specific carveout under which Tennessee beneficiaries receive a different pharmacy network than beneficiaries in other states. They must, in other words, restructure their PBM pharmacy networks around Tennessee's ownership rule. That is the kind of PBM-pharmacy-network regulation that has been held to be preempted. *See Mulready*, 78 F.4th at 1209-1212.

156. The Act does not fall within either of Medicare Part D's exceptions to preemption. The Act is not a "State law[] relating to plan solvency," and it does not purport to be. Nor is it a "State licensing law" within the meaning of the clause. A genuine licensing law governs whether an entity is fit to be licensed—regulating matters such as pharmacy safety, staffing, inspections, drug handling, dispensing accuracy, or pharmacist professional qualifications. The Act does none of those things. It instead dictates the corporate ownership structure of the enterprises permitted to operate Tennessee pharmacies, and in doing so controls which pharmacies a Part D sponsor may use to deliver benefits.

157. The Act is therefore preempted by the standards established under Part D, 42 U.S.C. §§1395w-26(b)(3), 1395w-112(g), and the regulations promulgated thereunder, barring its enforcement as applied to Medicare Part D plans and to ESI, Express Scripts Pharmacy, Accredo, ESSDS, and EnGuide in their service of Tennessean Part D beneficiaries.

46

## COUNT FOUR
### (ERISA Preemption, U.S. Const. art. VI, cl. 2; 29 U.S.C. §1001 *et seq.*)

158. Plaintiffs incorporate and re-allege paragraphs 1 through 127 as if fully set forth herein.

159. ERISA sets minimum standards for most voluntarily established retirement and health plans in private industry. 29 U.S.C. §1001 *et seq.*

160. ERISA expressly "preempts state law and state law claims that 'relate to' any employee benefit plan." *Cromwell v. Equicor-Equitable HCA Corp.*, 944 F.2d 1272, 1275-1276 (6th Cir. 1991) (citing 29 U.S.C. §1144).

161. "For a state law to 'relate to' an ERISA plan, and thus be preempted, the state law must have either an impermissible 'connection with' the plan or a 'reference to' it." *McKee Foods Corp. v. BFP, Inc.*, 173 F.4th 242, 263 (6th Cir. 2026) (quoting *Rutledge v. Pharmaceutical Care Management Association*, 592 U.S. 80, 86 (2020)).

162. A state law is impermissibly connected with ERISA plans if it implicates an "area of core ERISA concern"—for example, if it "requires providers to structure benefit plans in particular ways," governs a central matter of plan administration, or interferes with nationally uniform plan administration. *Egelhoff v. Egelhoff*, 532 U.S. 141, 147-148 (2001).

163. The Act is impermissibly connected with ERISA plans. Many ERISA-covered plans choose designs that rely on PBM-affiliated pharmacies as part of their pharmacy networks. And the "scope and extent of a plan's pharmacy network" is "a central matter of plan administration," *McKee*, 173 F.4th at 264. By prohibiting most of these pharmacies from operating in Tennessee, the Act forecloses plan design options that are "key benefit designs for an ERISA plan," *id.*—disrupting the pharmacy networks used by ERISA plans and forcing plan

administrators to adopt new Tennessee-specific network structures that rely on independent pharmacies.

164. A state law contains a "reference" to ERISA plans if it acts "immediately and exclusively upon ERISA plans" or if "the existence of ERISA plans" is "essential to the law's operation." *California Division of Labor Standards Enforcement v. Dillingham Construction, N.A., Inc.*, 519 U.S. 316, 325 (1997).

165. The Act contains a reference to ERISA plans. Namely, it includes a statutory carveout for employers who "own[] or operat[e] a pharmacy or administ[er] pharmacy benefits solely for [their] own employees, retirees, and dependents under an employee benefit plan." SB2040 §2(i). Because "employee benefit plan" is a term of art which describes ERISA plans, *see* 29 U.S.C. §1002, this constitutes a "reference to" ERISA plans, and the Act is therefore preempted by ERISA.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a) Declare that the Act violates the Constitution's dormant Commerce Clause;

b) Declare that the Act is preempted by the Federal TRICARE program;

c) Declare that the Act is preempted by Medicare Part D;

d) Declare that the Act is preempted by ERISA;

e) Preliminarily and permanently enjoin Defendants, their agents, successors in office, and all persons acting in concert with them from taking any action to enforce the Act against Plaintiffs;

f) Award Plaintiffs their attorneys' fees and costs incurred in bringing this action, including fees and costs under 42 U.S.C. §1988(b) for successful claims against state officials under 42 U.S.C. §1983; and

g)     Award Plaintiffs all other relief as the Court deems just and proper.


June 12, 2026

Respectfully submitted,

/s/ *Kevin Lamb*
Jennifer Milici (*pro hac vice* forthcoming)
Daniel S. Volchok (*pro hac vice* forthcoming)
Kevin M. Lamb (*pro hac vice* forthcoming)
Jane E. Kessner (*pro hac vice* forthcoming)
WILMER CUTLER PICKERING
   HALE AND DORR LLP
2100 Pennsylvania Avenue N.W.
Washington, D.C. 20037
(202) 663-6000 (tel.)
(202) 663-6363 (fax)
jennifer.milici@wilmerhale.com
daniel.volchok@wilmerhale.com
kevin.lamb@wilmerhale.com
jane.kessner@wilmerhale.com


/s/ *Webb Campbell*
William L. Harbison
L. Webb Campbell II
William J. Harbison II
SHERRARD ROE VOIGT &
   HARBISON, PLC
1600 West End Ave., Ste. 1750
Nashville, Tennessee 37203
(615) 742-4200 (tel.)
(615) 742-4539 (fax)
bharbison@srvhlaw.com
wcampbell@srvhlaw.com
jharbison@srvhlaw.com

49