**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE**

|  |  |
|---|---|
| EXPRESS SCRIPTS, INC., *et al.*,<br><br>        Plaintiffs,<br><br>    v.<br><br>MARLIN BLANE, *et al.*,<br><br>        Defendants. | Civil Action No. 3:26-cv-806<br><br>**Hearing Requested** |

**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION
AND MEMORANDUM OF LAW IN SUPPORT**

**TABLE OF CONTENTS**

Page

TABLE OF AUTHORITIES ...................................................................................................ii

INTRODUCTION ............................................................................................................... 1

BACKGROUND .................................................................................................................. 6

    A.    PBM-Affiliated Pharmacies, Including Plaintiffs, Serve Hundreds Of Thousands Of Tennesseans.................................................................... 6

    B.    The Defense Department Relies On ESI-Affiliated Pharmacies To Provide Services To Military Families Through The TRICARE Program ............ 8

    C.    The Act Will Banish Most PBM-Affiliated Pharmacies, Including Plaintiffs, From Tennessee.................................................................... 10

LEGAL STANDARD........................................................................................................... 10

ARGUMENT ..................................................................................................................... 11

I.    PLAINTIFFS WILL LIKELY SUCCEED ON THEIR TRICARE-PREEMPTION CLAIM ............... 11

    A.    The Act Is Expressly Preempted............................................................... 11

    B.    The Act Is Implicitly Preempted............................................................... 13

II.    PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION.......... 17

    A.    Constitutional Violations ...................................................................... 18

    B.    Unrecoverable Economic Loss ................................................................ 18

    C.    Loss Of Patient Relationships.................................................................. 19

III.    THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF........... 21

CONCLUSION................................................................................................................... 23

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Aldridge v. Regions Bank*,
144 F.4th 828 (6th Cir. 2025) ...................................................................................17

*Appalachian Regional Healthcare v. Coventry Health & Life Insurance Company*,
2012 WL 2359439 (E.D. Ky. June 20, 2012) .................................................................22

*Basicomputer Corporation v. Scott*,
973 F.2d 507 (6th Cir. 1992) .............................................................................20, 21

*Buckman Company v. Plaintiffs' Legal Committee*,
531 U.S. 341 (2001)........................................................................................17

*Collins Inkjet Corporation v. Eastman Kodak Company*,
781 F.3d 264 (6th Cir. 2015) ...............................................................................20

*Edelman v. Jordan*,
415 U.S. 651 (1974).......................................................................................18

*Elrod v. Burns*,
427 U.S. 347 (1976).......................................................................................18

*Express Scripts, Inc. v. Richmond*,
2025 WL 2111057 (E.D. Ark. July 28, 2025) ...........................................................3, 12

*Frontier Health Inc. v. Shalala*,
113 F.Supp.2d 1192 (E.D. Tenn. 2000)........................................................................22

*Gade v. National Solid Wastes Management Association*,
505 U.S. 88 (1992)........................................................................................11

*Healy v. Beer Institute, Inc.*,
491 U.S. 324 (1989)........................................................................................17

*In re Ford Motor Company Litigation*,
65 F.4th 851 (6th Cir. 2023) .......................................................................11, 13, 16

*Kentucky v. Biden*,
57 F.4th 545 (6th Cir. 2023) ......................................................................11, 18, 19

*Leslie Miller, Inc. v. Arkansas*,
352 U.S. 187 (1956)........................................................................................16

*Michigan First Credit Union v. T-Mobile USA, Inc.*,
108 F.4th 421 (6th Cir. 2024) .................................................................................11

Case 3:26-cv-00806    Document 25    Filed 06/18/26    Page 3 of 28 PageID #: 340

*Obama for America v. Husted*,
  697 F.3d 423 (6th Cir. 2012) ...................................................................................18

*Overstreet v. Lexington-Fayette Urban County Government*,
  305 F.3d 566 (6th Cir. 2002) ...................................................................................17

*United States v. Arizona*,
  641 F.3d 339 (9th Cir. 2011) ...................................................................................18

*Vitolo v. Guzman*,
  999 F.3d 353 (6th Cir. 2021) ...................................................................................21

*Wilson v. Williams*,
  961 F.3d 829 (6th Cir. 2020) ...................................................................................21

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008)...............................................................................................10, 11

## STATUTES AND REGULATIONS

10 U.S.C.
  §1071.......................................................................................................................8, 16
  §1073.............................................................................................................................9
  §1073a..............................................................................................................9, 14, 16
  §1074g..........................................................................................................8, 9, 16
  §1103.......................................................................................................................3, 12

32 C.F.R.
  §199.17.................................................................................................................3, 12, 13
  §199.21...................................................................................3, 8, 12, 13, 16, 18

Tenn. Senate Bill 2040 (to be codified at Tenn. Code §63-10-3).............................1, 3, 10, 12, 13

## LEGISLATIVE MATERIALS

Fiscal Memorandum, SB2040-HB1959 (Apr. 7, 2026)..................................................10

## OTHER AUTHORITIES

America's Health Rankings, *Rural Population in Tennessee*,
  tinyurl.com/32f6hk2w..................................................................................................7

Defense Logistics Agency, *Next Generation Pharmaceutical Contract Provides
  Major Benefits for Military Customers* (July 29, 2022),
  https://tinyurl.com/37epksp3 .....................................................................................14

Mulligan, Casey B., *The Value of Pharmacy Benefit Management*, National
  Bureau of Economic Research Working Paper No. 30231 (2022).....................................6

iii

Tennessee Pharmacists Association, *2026 Legislative Updates* (Jan. 27, 2026),
https://tinyurl.com/5xbfdbaa ................................................................................................3

U.S. Department of Defense, *Fiscal Year 2024 TRICARE Program Evaluation
Report* (Sept. 23, 2025) ............................................................................................8, 10

U.S. Government Accountability Office, GAO-25-107187, *Defense Health Care*
(Feb. 2025) ...........................................................................................................14

iv

Pursuant to Federal Rule of Civil Procedure 65, and upon the declarations of Thomas Jenkins, Susan Peppers, and Holly Thompson, and all other pleadings and proceedings in this action, Plaintiffs move for an order (1) holding that Tennessee's Freedom, Access, and Integrity in Registered Pharmacy Act is likely preempted by the U.S. Department of Defense's TRICARE program; (2) preliminarily enjoining Defendants and their employees, agents, and successors in office from enforcing the Act against Plaintiffs; and (3) granting such other relief as the Court deems just and proper.

As set forth in detail in the attached memorandum of law, a preliminary injunction is warranted because Plaintiffs are likely to succeed on the merits of their TRICARE-preemption claim; they will likely suffer irreparable harm absent relief; and the balance of the equities and public interest favor an injunction.

Prior to filing this motion, in accordance with Local Rule 7.01(a)(1), Plaintiffs' counsel advised Defendants' counsel of their intent to move for a preliminary injunction. Defendants' counsel indicated that they would oppose the motion.

## INTRODUCTION

For decades, Plaintiffs—Express Scripts, Inc. ("ESI"), its affiliated pharmacies, and Evernorth Federal Services ("EFS")—have been trusted by hundreds of thousands of Tennesseans to provide high-quality, safe, convenient, and affordable mail-order pharmacy services, including to thousands of military servicemembers receiving federally-mandated pharmacy benefits. But a recently-enacted Tennessee law, known as SB2040 or the Freedom, Access, and Integrity in Registered Pharmacy Act ("Act"), would banish ESI-affiliated pharmacies from Tennessee simply because they are affiliated with both ESI, a pharmacy benefits manager ("PBM"), and Cigna Healthcare, a health insurer. As detailed in Plaintiffs' complaint, the Act violates federal law in

1

several ways. But as relevant to this motion, it is preempted by the statute and regulations governing the U.S. Department of Defense's TRICARE program, which provides healthcare services to military servicemembers, retirees, and their families. Given the Act's preemption by TRICARE, and because the Act will imminently harm Plaintiffs irreparably and disserves the public interest, the Court should preliminarily enjoin the Act's enforcement.

A.   ESI-affiliated pharmacies dispense millions of prescriptions to Tennessee patients each year. Indeed, just two Plaintiffs, Express Scripts Pharmacy, Inc. and ESI Mail Pharmacy Service, Inc. (together, "Express Scripts Pharmacy"), delivered more than 2 million prescriptions to over 147,000 patients throughout Tennessee in 2025 alone. And Plaintiff Accredo Health Group, Inc. ("Accredo"), a specialty pharmacy with a significant portion of its nationwide operations in Memphis, dispensed more than 168,000 prescriptions to over 32,000 Tennesseans with complex and chronic medical conditions. Finally, the other Plaintiff pharmacies—which focus on fertility, complex sleep disorders, and GLP-1s—collectively dispensed more than 43,500 additional prescriptions to several thousand Tennesseans in 2025.

In total, over 180,000 Tennesseans rely on ESI-affiliated pharmacies today, including more than 44,000 TRICARE beneficiaries. These individuals include people who require routine maintenance medications to sustain their health and vitality, people with complex and grave medical conditions whose lives depend on continuous access to medication provided by specialty pharmacies, and everyone in between.

Plaintiffs' connection to Tennessee, moreover, is not just the patients they serve. Accredo maintains a substantial presence in the state; its Memphis pharmacy spans over 116,000 square feet and holds approximately $900 million in inventory on any given day. And Accredo and other ESI-affiliated pharmacies employ more than 1,200 people across the state.

2

B. Although the Act imperils the health of all of Plaintiffs' Tennessee patients and hundreds of thousands more outside Tennessee, it cannot be enforced because it is preempted by federal law. Indeed, a similar law enacted last year in Arkansas, Act 624, has already been preliminarily enjoined as likely preempted by TRICARE—a ruling that Arkansas chose not to challenge in its appeal. *See Express Scripts, Inc. v. Richmond*, 2025 WL 2111057, at *3-4 (E.D. Ark. July 28, 2025), *appeal pending*, No. 25-2529 (8th Cir.). The enjoining of the Arkansas law is particularly relevant given that the Tennessee Act's own supporters stated that it "aligns with Arkansas' Act 624 of 2025, which established similar ownership restrictions." Tennessee Pharmacists Association, *2026 Legislative Updates* (Jan. 27, 2026), https://tinyurl.com/5xbfdbaa.

In an apparent effort to avoid a similar TRICARE-preemption ruling here, the Tennessee Act (which proceeded through the state senate as Senate Bill ("SB") 2040) carves out "pharmacy services provided pursuant to a contract with the United States government." SB2040 §2(j). But that does not avoid either express or implied preemption by TRICARE.

As to express preemption, the carveout does not change the fact that the Act is a state statute "relating to health insurance … or other health care delivery." 10 U.S.C. §1103(a). Congress has preempted all such laws "to the extent" the Secretary of Defense determines "necessary." *Id.* And the Secretary has categorically "determined" that "preemption" of such laws as to those who serve TRICARE beneficiaries "is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense." 32 C.F.R. §§199.17(a)(7)(i), 199.21(o)(1).

As to implied preemption, the carveout is unavailing because the services Plaintiffs provide to non-TRICARE beneficiaries are closely intertwined with the services they provide to TRICARE

3

beneficiaries—such that prohibiting the former impermissibly interferes with their performance of their contractual obligations for TRICARE. Specifically, the TRICARE contract uses a "replenishment" model to maximize value and cost savings to the federal government. Under this model, ESI-affiliated pharmacies must dispense prescriptions to TRICARE beneficiaries from their own, commercially-acquired inventory and then request "replenishment" of the same medications from the federal government's wholesale pharmaceutical distributor. Without access to the commercial market, the replenishment model cannot properly function, and the government cannot realize its anticipated savings. Even apart from replenishment, the business models of these ESI-affiliated pharmacies depend on serving non-TRICARE patients alongside TRICARE patients; it is not feasible for them to serve TRICARE beneficiaries exclusively.

Nor can these problems be avoided by simply replacing the Plaintiff pharmacies with non-affiliated ones. The current TRICARE contract (known as TPharm5) specifies that Express Scripts Pharmacy, Accredo (including the Memphis facility) and Freedom Fertility will provide pharmacy services to TRICARE beneficiaries. Tennessee has no power to mandate a change to those federally-approved parties.

Finally, in determining whether the Act is preempted by federal law, the proper question for preemption purposes is not whether the Act alone impermissibly interferes with the TRICARE program but whether there would be such interference if *every* state passed a law like the Act and thereby similarly banished Plaintiffs from their respective territories. The answer is a resounding yes: Such state bans across all 50 states would unquestionably obstruct the mail-order and specialty pharmacy services required by the TRICARE contract.

C. The Act will inflict enormous harm on Plaintiffs and others, in Tennessee and beyond. To begin with, it will harm patients, depriving them of the pharmacies they rely on. Some

4

of those patients rely on national mail-order pharmacies (including Plaintiffs), which the Act will bar from delivering prescriptions to patients in Tennessee. Other patients rely on pharmacies with physical locations in Tennessee, which will be shuttered by the Act. That includes both brick-and-mortar retail pharmacies and Accredo's Memphis pharmacy—which serves tens of thousands in Tennessee (as well as nearly half a million patients across the country).

In addition to harming patients, the Act inflicts irreparable harm directly on Plaintiffs. All ESI-affiliated pharmacies will lose the ability to conduct business in Tennessee, and Accredo will be forced to relocate to another state (or shut down) its entire Memphis pharmacy operation. Relocating Accredo would cost Plaintiffs well over $100 million, while shutting the operation down would be an enormous loss because the Memphis pharmacy constitutes a significant portion of Accredo's nationwide operations, serving nearly 40% of Accredo patients nationwide and dispensing over a quarter of Accredo's total prescriptions.

In addition, the Act will irreparably harm Plaintiff pharmacies by causing customer and employee attrition. Faced with the prospect of losing their pharmacies, many patients will likely transfer their business to other pharmacies preemptively, especially patients managing serious conditions who cannot risk an interruption in therapy. And likewise, many Accredo employees in Tennessee, faced with the prospect of losing their jobs, will likely start looking for and accepting other jobs preemptively. These losses—of employees, patients, and goodwill—will be irreparable because neither patients who have transferred to other pharmacies nor employees who have taken other jobs will likely switch back even if Plaintiffs ultimately prevail here. The direct monetary costs to Plaintiffs (from relocating the Memphis pharmacy, for example) would similarly be irreparable, because state sovereign immunity would likely foreclose Plaintiffs from recovering those costs even if they ultimately prevailed on the merits.

5

The irreparable harms to Plaintiffs will occur long before the Act takes full effect on July 1, 2028. For starters, many of Plaintiffs' patients, employees, and business partners cannot or will not (as noted) wait until then before acting. And the process of relocating Accredo's Memphis pharmacy operation to another state—and securing the necessary licenses and accreditations to operate nationwide—will have to begin almost immediately given how long it will take. Put simply, the harms here are not only irreparable but also imminent. Given these harms and the Act's clear preemption by federal law, this Court should preliminarily enjoin Defendants from enforcing the Act against Plaintiffs.

## BACKGROUND

### A. PBM-Affiliated Pharmacies, Including Plaintiffs, Serve Hundreds Of Thousands Of Tennesseans

PBMs play an indispensable role in the provision of healthcare. They are the only entities in the prescription-drug supply chain whose purpose is to help health plan sponsors and their members pay less for prescription drugs. *See* Mulligan, *The Value of Pharmacy Benefit Management* 1, National Bureau of Economic Research Working Paper No. 30231 (2022). PBMs negotiate lower costs for prescription drugs and provide administrative services to improve the efficiency and quality of benefits. Peppers Decl. ¶¶5-6.

To enhance these efficiencies, some PBMs own (or share common ownership with) pharmacies. For example, the three largest PBMs (ESI, CVS Caremark, and Optum Rx) have affiliated mail-order and specialty pharmacies, while Caremark and Optum Rx also have affiliated retail (brick-and-mortar) pharmacies. Peppers Decl. ¶7. PBM-affiliated pharmacies offer simplified payment procedures and other efficiencies that make access to prescription drugs more convenient and affordable. *Id.* Tens of millions of Americans, including millions in Tennessee, rely on PBM-affiliated pharmacies—including Plaintiffs here. *Id.*

6

Accredo, for example, serves more than a million Americans, including tens of thousands of Tennesseans, who have complex and chronic medical conditions such as cancer, bleeding disorders, multiple sclerosis, and a range of rare diseases. Peppers Decl. ¶¶9, 19. For instance, Accredo serves patients with rheumatoid arthritis, shipping their prescriptions in special packaging with the necessary supplies. Thompson Decl. ¶¶6, 11. Across conditions, Accredo helps patients by providing 24/7 access to specialists and connects patients with copay assistance where available. *Id.* ¶¶8, 12; Peppers Decl. ¶¶9-10, 29.

Accredo has a large pharmacy operation in Memphis that serves patients both in Tennessee and nationwide, holding credentials across all 50 states, the District of Columbia, and multiple U.S. territories. Peppers Decl. ¶23. Accredo and other ESI-affiliated pharmacies employ more than 1,200 people in Tennessee pharmacy operations, including highly skilled pharmacists, pharmacy technicians, and nurses. *Id.* ¶24. In 2025, Accredo's Memphis pharmacy dispensed over 2.3 million prescriptions to nearly half a million patients nationwide (of the nearly 8 million prescriptions Accredo dispenses to over 1 million patients annually). *Id.* ¶¶9, 23. That included more than 128,000 prescriptions to almost 26,000 patients in Tennessee (of the 168,000 prescriptions Accredo dispensed to over 32,000 patients in Tennessee). *Id.* ¶¶19, 23. And it did so with near-perfect accuracy: In 2025, the Memphis pharmacy had accuracy rates of 99.999899% for its front-end dispensing and 99.999264% for its fulfillment processing. *Id.* ¶16.

The other Plaintiff pharmacies likewise provide critical prescriptions to patients across Tennessee. For example, Express Scripts Pharmacy delivered more than 2 million prescriptions to over 147,000 patients throughout Tennessee last year, Peppers Decl. ¶19, providing a vital resource for Tennesseans, especially the third of whom live in rural areas and thus may not have a brick-and-mortar pharmacy nearby. *See* America's Health Rankings, *Rural Population in*

*Tennessee*, tinyurl.com/32f6hk2w.  Similarly, Plaintiffs Village Fertility Pharmacy, LLC; Healy Pharmacy, LLC d/b/a Village Fertility Pharmacy; and Integrity Rx Specialty Pharmacy LLC (collectively, "VFP") dispensed more than 12,000 prescriptions to help over 3,200 patients across Tennessee last year grow their families.  Peppers Decl. ¶¶14, 19.  Plaintiffs Lynnfield Drug, Inc. d/b/a Freedom Fertility Pharmacy and Lynnfield Compounding Center, Inc. d/b/a Freedom FP Fertility Pharmacy (together, "Freedom Fertility") likewise delivered more than 9,000 fertility prescriptions to over 800 Tennesseans.  *Id.* ¶¶13, 19.  Express Scripts Specialty Distribution Services, Inc., meanwhile, dispensed more than 6,500 prescriptions to nearly 800 Tennesseans suffering from complex sleep disorders.  *Id.* ¶¶12, 19.  And MAH Pharmacy, LLC d/b/a Evernorth EnGuide Pharmacy dispensed more than 16,000 GLP-1 prescriptions to over 8,000 patients in Tennessee.  *Id.* ¶¶15, 19.

**B.     The Defense Department Relies On ESI-Affiliated Pharmacies To Provide Services To Military Families Through The TRICARE Program**

Through the TRICARE program, the U.S. Defense Department ("DoD") provides federally-mandated healthcare entitlements to military servicemembers, retirees, and their families.  *See* 10 U.S.C. §1071 *et seq.*  TRICARE provides healthcare and prescription-drug benefits to roughly 9.4 million beneficiaries in all 50 states, the District of Columbia, U.S. territories, and overseas.  DoD, *Fiscal Year 2024 TRICARE Program Evaluation Report* at 6 (Sept. 23, 2025).  TRICARE beneficiaries may receive healthcare services at "military treatment facilities," such as DoD-operated hospitals, clinics, and pharmacies, or via networks of participating civilian healthcare providers.  *Id.* at 7.

TRICARE's enabling statute requires DoD to "establish an effective, efficient, [and] integrated pharmacy benefits program" as part of TRICARE.  10 U.S.C. §1074g.  This program is known as the TRICARE Pharmacy Benefits Program. 32 C.F.R. §199.21.  By statute, that program

must satisfy a host of requirements, including making prescription drugs available to TRICARE beneficiaries through DoD-operated pharmacies, a retail pharmacy network, and a national mail-order pharmacy program. 10 U.S.C. §1074g(a)(2)(E). The Defense Health Agency ("DHA"), a DoD component, administers TRICARE by contracting with private health insurance and healthcare delivery companies. *Id.* In awarding contracts, DHA must ensure that TRICARE "provide[s] a stable program of benefits," *id.* §1073(b), and it may award contracts only to "the offeror or offerors that will provide the best value to the United States to the maximum extent consistent with furnishing high-quality health care in a manner that protects the fiscal and other interests of the United States," *id.* §1073a(a).

Since 2003, DHA has contracted with ESI for the delivery of pharmacy services to TRICARE beneficiaries. *See* Jenkins Decl. ¶7. In 2025, EFS—a subsidiary of Evernorth Health Services and affiliate of ESI—was created using the leadership and personnel of the Military and Veteran Division of ESI, and the same year, the contract with DHA was transferred from ESI to EFS by novation. Jenkins Decl. ¶¶3, 5, 7. The current contract (again, TPharm5), requires EFS to furnish nationwide mail-order pharmacy services, providing that EFS's "mail order facilities shall dispense and deliver medications to TRICARE beneficiaries." TPharm5 (Am. Compl. Ex. B) §C.6.1.1. EFS delivers those services through Express Scripts Pharmacy, the mail-order pharmacy under the contract. Jenkins Decl. ¶9. Additionally, under section C.6.1 of the contract, Accredo and Freedom Fertility have been "designated" by ESI and EFS and "approved" by the government to "dispense specialty [pharmaceutical] agents" by "mail order" to TRICARE beneficiaries. TPharm5 §C.6.1; Jenkins Decl. ¶12.

Together, these pharmacies dispensed over 753,000 prescriptions to TRICARE beneficiaries in Tennessee in 2025. Jenkins Decl. ¶¶10, 14. The mail-order services are especially

important for those living in rural areas, who would otherwise need to travel to a military treatment facility or in-network retail pharmacy to acquire their medications. *See* DoD, *Fiscal Year 2024 TRICARE Program Evaluation Report* at 7 (Sept. 23, 2025). For TRICARE beneficiaries who live in remote areas or have mobility limitations, such travel may be impractical or even impossible.

### C. The Act Will Banish Most PBM-Affiliated Pharmacies, Including Plaintiffs, From Tennessee

If it takes full effect, the Act will prohibit nearly all PBM-affiliated pharmacies from operating in Tennessee.

Specifically, the Act provides that, starting on July 1, 2028, a "person or entity shall not" "[d]irectly or indirectly own, operate, control, or direct the operation of, the whole or any part of a pharmacy" and also "[d]irectly or indirectly own, operate, control, or direct the operation of, the whole or any part of" a "health insurance issuer" and a "pharmacy benefits manager." SB2040 §2(b), to be codified in Tennessee Code Title 63, Chapter 10, Part 3. Because nearly all PBMs with affiliated pharmacies are also affiliated with a health-insurance issuer—as the legislature recognized, *see* Fiscal Memorandum, SB2040-HB1959 (Apr. 7, 2026), at 3—the Act prohibits virtually all PBM-affiliated pharmacies from operating in Tennessee.

To implement this prohibition, the Tennessee Board of Pharmacy is authorized to promulgate rules, SB2040 §3, and is required to refer potential violations to the Tennessee Attorney General, *id.* §2(f)(2), who is authorized to enforce the law, *id.* §2(f)(1). Pharmacies that violate the law are "subject to a civil penalty of up to ten thousand dollars" per day. *Id.* §2(f)(3).

### LEGAL STANDARD

Plaintiffs are entitled to a preliminary injunction upon showing that (1) they are "likely to succeed on the merits"; (2) they are "likely to suffer irreparable harm in the absence of preliminary

10

relief"; (3) "the balance of equities tips in [their] favor"; and (4) "an injunction is in the public interest." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 20 (2008).  The third and fourth factors "merge when the government is the defendant." *Kentucky v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

## ARGUMENT

### I. PLAINTIFFS WILL LIKELY SUCCEED ON THEIR TRICARE-PREEMPTION CLAIM

Plaintiffs are likely to succeed on their claim that the TRICARE statute and implementing regulations preempt the Act's application to ESI, Express Scripts Pharmacy, Accredo, Freedom Fertility, and EFS.

Under the U.S. Constitution's Supremacy Clause, a state statute is expressly preempted "when a federal statute … explicitly indicates that it is preempting 'a specific type of state law.'" *Michigan First Credit Union v. T-Mobile USA, Inc.*, 108 F.4th 421, 430 (6th Cir. 2024).  State law may also be preempted implicitly, such as when a state law "actually conflicts with federal law, that is, when it is impossible to comply with both state and federal law, or where the state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress." *In re Ford Motor Company Litigation*, 65 F.4th 851, 859-860 (6th Cir. 2023).  Here, the TRICARE statute both expressly and implicitly preempts the Act's application to EFS, ESI, and their affiliated pharmacies that provide TRICARE services.  (Either one suffices for Plaintiffs to prevail and hence for the first factor to favor an injunction.)

### A. The Act Is Expressly Preempted

TRICARE expressly preempts the Act because the enabling statute includes "explicit pre-emptive language," *Gade v. National Solid Wastes Management Association*, 505 U.S. 88, 98 (1992) (plurality).  Specifically, the statute provides that state laws or regulations "relating to health insurance … or other health care delivery … shall not apply to any [TRICARE] contract"

if the Defense Secretary determines that (1) the state laws or regulations are "inconsistent with a specific provision of the contract or a regulation promulgated" to administer TRICARE, or (2) preemption "is necessary to implement or administer the provisions of the contract or to achieve any other important Federal interest." 10 U.S.C. §1103(a). Exercising this authority, the Secretary has categorically "determined that" the "preemption of State and local laws relating to health insurance … or other health care delivery … is necessary to achieve important Federal interests, including but not limited to the assurance of uniform national health programs for military families and the operation of such programs at the lowest possible cost to the Department of Defense." 32 C.F.R. §§199.17(a)(7)(i), 199.21(o)(1).

Given these regulations, the only question is whether the Act falls within the scope of what Congress has said is preempted, i.e., whether the Act is a state law "relating to health insurance … or other health care delivery," 10 U.S.C. §1103(a). It is. The Act plainly relates to health insurance because it bars pharmacies from being affiliated with both a PBM and a "*health insurance* issuer." SB2040 §2(b)(2) (emphasis added). Moreover, its preamble explicitly states (with emphasis added) that the Act is "intended to strengthen the integrity of Tennessee's *healthcare delivery* system." The Act also completely forbids certain pharmacies from operating in the state of Tennessee, thereby affecting—in other words, "relating to," 10 U.S.C. §1103(a)—their ability to deliver health care. The Act is therefore explicitly preempted.

That conclusion is consistent with the ruling last year of the district court in Arkansas that preliminarily enjoined the very similar Arkansas Act 624. The court reasoned that the Arkansas statute was "explicitly preempted by TRICARE's 'health care delivery' provision because Act 624 prohibits PBM-owned pharmacies from delivering healthcare to Arkansas patients." *Express Scripts*, 2025 WL 2111057, at *4. Notably, although Arkansas has appealed the order granting

the preliminary injunction, its briefs to the Eighth Circuit included no challenge whatsoever to the district court's TRICARE-preemption ruling, confirming that the ruling was correct.

Lastly, the Act's carveout for "pharmacy services provided pursuant to a contract with the United States government," SB2040 §2(j), does not save it from express preemption because it does not change the dispositive fact, which is that the Act expressly relates to health insurance and healthcare delivery. And the Secretary of Defense has categorically determined that federal interests require preempting any application of such a law to any TRICARE contract—like the one pursuant to which ESI, EFS, Express Scripts Pharmacy, Accredo, and Freedom Fertility all serve TRICARE beneficiaries. 32 C.F.R. §§199.17(a)(7)(i), 199.21(o)(1).

### B. The Act Is Implicitly Preempted

TRICARE implicitly preempts the Act because the Act's provisions "stand[] as an obstacle to the accomplishment of the full purposes and objectives of Congress" in enacting TRICARE, *In re Ford*, 65 F.4th at 859-860. Indeed, even considered alone, these provisions impede the purposes and operation of the TRICARE contract and program. And there is no question they would do so if also enacted by every other state, which as discussed below is the proper preemption analysis.

1. As noted, the Act "does not apply to pharmacy services provided pursuant to a contract with the United States government for the administration of a federal healthcare program by the department of defense." SB2040 §2(j). But the Act does not exempt the *entities* that provide such services from its required divestment if they provide any other services. In other words, the carveout protects only PBM-affiliated pharmacies that *exclusively* serve government contracts. Hence, Plaintiffs will be prohibited from operating in Tennessee if they provide pharmacy services to any non-TRICARE patients. And Accredo, Express Scripts Pharmacy, and Freedom Fertility provide *the bulk* of their pharmacy services to patients who are not TRICARE beneficiaries. The

13

Act prohibits these commercial services, on which EFS's TRICARE contract depends, and thus interferes with Plaintiffs' performance of their obligations, in several ways.

To begin with, the Act frustrates Plaintiffs' use of the "replenishment" model, a contractually-required element that ensures Plaintiffs' performance of the TPharm5 contract "provide[s] the best value" to the United States, 10 U.S.C. §1073a(a); *see* Jenkins Decl. ¶16. Under this model, the contracting pharmacy must dispense prescriptions to TRICARE beneficiaries from its own, commercially-acquired inventory and then request "replenishment" of those same medications from the government's wholesale pharmaceutical distributor (referred to as the "National Prime Vendor" or "NPV"). TPharm5 §§C.6.1, C.6.8, C.6.8.5; Jenkins Decl. ¶16.

The replenishment model creates significant savings for the TRICARE program because it takes advantage of government-specific pricing (laid out in a separately negotiated contract between the government and the NPV). *See* TPharm5 §§C.4.7, C.6.8, C.8.3, C.8.5. Specifically, the NPV "can obtain drugs at a fixed percentage discount off the lowest price otherwise available for each drug," "generally 24 percent less," than the retail average. U.S. Government Accountability Office, GAO-25-107187, *Defense Health Care*, at 14 n.21 (Feb. 2025) (citing 38 U.S.C. §8126(a)(2)). The government itself has recognized this "benefit" of the replenishment model, praising the "increased cost avoidance" and calling out the "extremely favorable price" the government has been able to negotiate for pharmaceuticals "in a very unforgiving acquisition environment." Defense Logistics Agency, *Next Generation Pharmaceutical Contract Provides Major Benefits for Military Customers* (July 29, 2022), https://tinyurl.com/37epksp3. The Act disrupts those benefits by impeding the replenishment program: Without access to the commercial market, the replenishment model cannot properly function, and the government will not be able to realize its anticipated savings. Jenkins Decl. ¶16.

The foregoing confirms that the Act's TRICARE carveout does not avoid preemption. Again, the carveout exempts only PBM-affiliated pharmacies that *exclusively* serve TRICARE beneficiaries. Hence, Plaintiffs will still be prohibited from operating in Tennessee if they provide pharmacy services to any non-TRICARE patients—as they all do, because as explained they must do so in order to comply with TPharm5 requirements while retaining an economically viable business.

Even apart from replenishment, the business models of Express Scripts Pharmacy, Accredo, and Freedom Fertility depend on serving non-TRICARE patients alongside TRICARE patients. Jenkins Decl. ¶17. Those Plaintiffs each provide most of their pharmacy services to patients who are not TRICARE beneficiaries. Peppers Decl. ¶¶19, 21. And it is not feasible for these pharmacies to serve TRICARE beneficiaries exclusively because, given the total number of TRICARE beneficiaries, there would not be sufficient economies of scale to support a pharmacy that can provide the widely varied medications and services that those beneficiaries need. Jenkins Decl. ¶17.

Moreover, the Act will impede Accredo's ability to provide specialty pharmacy services to TRICARE beneficiaries within Tennessee, by forcing Accredo's Memphis facility to relocate to another state. Even if the replacement facility could manage to ship medications to Tennessee patients as quickly—which is far from guaranteed—Accredo's Tennessee pharmacy does not only ship medications to patients' homes; it also pairs medications with clinical care, such as home-infusion services. Peppers Decl. ¶¶9, 22, 24.

2. The problems just discussed cannot be avoided by replacing the Plaintiff pharmacies with non-affiliated ones, because DHA has assented to EFS's use of Express Scripts Pharmacy, Accredo (including the Memphis facility), and Freedom Fertility for the TPharm5

15

contract: When ESI applied for the current TRICARE contract, it informed DoD of its intent to use Express Scripts Pharmacy as TRICARE's mail-order pharmacy. Jenkins Decl. ¶9. And under section C.6.1 of TPharm5, Accredo and Freedom Fertility have been "designated" by ESI and EFS—and "approved" by the government—to "dispense specialty [pharmaceutical] agents" by "mail order" to TRICARE beneficiaries. TPharm5 §C.6.1; Jenkins Decl. ¶12. That approval is reflected in the 2021 modifications to the TPharm5 contract listing particular ESI-affiliated facilities authorized for replenishment, including Accredo's Memphis location. Am. Compl. Ex. C at F5.

Tennessee is not authorized to dictate changes to those federally designated and approved parties. As the Supreme Court put it, states do not have "a virtual power of review" over DoD's contracting decisions, *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam). In any event, entering into a new arrangement would increase costs and thereby undermine the value to the U.S. government, contrary to the TRICARE program's requirements. In particular, EFS would no longer be able to take advantage of the efficiencies and savings created by the integrated-pharmacy model. *See* Jenkins Decl. ¶19. By adding costs to the price of the TPharm5 contract, the Act constitutes "an obstacle to the accomplishment of the full purposes and objectives of Congress," *In re Ford*, 65 F.4th at 859-860, one of which was minimizing the cost to the government of the TRICARE program, *see* 10 U.S.C. §1073a(a). Moreover, any switch by EFS to an unaffiliated mail-order or specialty pharmacy would have to be done nationwide, because the TRICARE statute requires that the program be administered "uniform[ly]," 10 U.S.C. §1071, and "national[ly]," *id.* §1074g(a)(2)(E)(iii); 32 C.F.R. §199.21(o)(2). But to Plaintiffs' knowledge, all such nationwide pharmacies with the requisite specialty-pharmacy capabilities are affiliated with other PBMs, and therefore covered by the Act. Jenkins Decl. ¶20.

16

3. Finally, the proper implied-preemption analysis is whether it would frustrate Congress's objectives for *every* state to enact a law like the Act. That is the proper analysis because if federal law allows one state to enact a particular statute, then it must allow every state to do so; there is no sound basis to draw the line at one state (or five or ten or thirty). Indeed, the Supreme Court has explained the proper analysis explicitly in the context of a challenge under the dormant Commerce Clause, observing that "the practical effect of the statute must be evaluated not only by considering the consequences of the statute itself, but also by considering … what effect would arise if not one, but many or every, State adopted similar legislation," *Healy v. Beer Institute, Inc.*, 491 U.S. 324, 336 (1989). And the Court has taken the same approach in the preemption context. For example, the Court held that a state's tort law was implicitly preempted after noting that "complying with [federal law's] detailed regulatory regime in the shadow of *50 States'* tort regimes will dramatically increase the burdens facing potential applicants." *Buckman Co. v. Plaintiffs' Legal Committee*, 531 U.S. 341, 350 (2001) (emphasis added). Likewise, the Sixth Circuit has held that ERISA preempted certain state-law causes of action because "Congress contemplated that ERISA's fiduciary duties would be replaced by the contractual duties set forth in these plans— not by the fiduciary-duty rules from all 50 States." *Aldridge v. Regions Bank*, 144 F.4th 828, 842-843 (6th Cir. 2025). Similarly here, if every state adopted a law like the Act, there would be no out-of-state commercial inventory or patients to sustain ESI's affiliated pharmacies' TRICARE services in Tennessee (or in any other state).

## II. PLAINTIFFS WILL LIKELY SUFFER IRREPARABLE HARM WITHOUT AN INJUNCTION

Absent an injunction, Plaintiffs will likely suffer irreparable harm from the Act imminently. Harm from government action is irreparable when it "is not fully compensable by monetary damages" or otherwise cannot be undone by a later judgment. *Overstreet v. Lexington-*

*Fayette Urban County Government*, 305 F.3d 566, 578 (6th Cir. 2002).  The Act will likely inflict three types of imminent irreparable harm—each of which independently warrants a preliminary injunction.

## A.      Constitutional Violations

For starters, "[w]hen constitutional rights are threatened or impaired, irreparable injury is presumed."  *Obama for America v. Husted,* 697 F.3d 423, 436 (6th Cir. 2012).  That presumption reflects the Supreme Court's recognition that even a temporary deprivation of a constitutional protection can be irreparable because the injury lies in the deprivation itself, not just its downstream consequences.  *See Elrod v. Burns*, 427 U.S. 347, 373 (1976).  The same principle extends to the Supremacy Clause context, where "an alleged constitutional infringement will often alone constitute irreparable harm" because "the interest of preserving the Supremacy Clause is paramount."  *United States v. Arizona*, 641 F.3d 339, 366 (9th Cir. 2011), *aff'd in part, rev'd in part on other grounds*, 567 U.S. 387 (2012).  Here, because Plaintiffs are likely to succeed on their TRICARE-preemption claim, they should not be forced during this litigation to comply with a state-law command that federal law renders "without any force or effect," 32 C.F.R. §199.21(o)(2).  Avoiding such forced compliance warrants preliminary relief.

## B.      Unrecoverable Economic Loss

Absent a preliminary injunction, the Act will impose well over $100 million in costs on Plaintiffs—costs Plaintiffs will be unable to recover from Defendants even if Plaintiffs ultimately prevail, because of state sovereign immunity, *see Edelman v. Jordan*, 415 U.S. 651, 663 (1974).  As the Sixth Circuit has explained, where plaintiffs are "likely to incur … compliance costs in the absence of a preliminary injunction," "sovereign immunity typically makes [those] monetary losses … irreparable."  *Kentucky*, 57 F.4th at 556.  The irreparable harm, moreover, does not turn on whether unrecoverable compliance costs are modest or massive.  *See id.*  But the harm's

"peculiarity and size" does "affect[] its weight in the equitable balance." *Id*. Here, the vast costs the Act imposes give Plaintiffs' harm substantial weight.

Plaintiffs will also begin to incur those costs imminently. In particular, relocating Accredo's Memphis pharmacy to another state will be a monumental undertaking. That operation—which serves nearly 40% of all Accredo patients across the country—is a large, specialized, national pharmacy hub that spans more than 116,000 square feet, holds approximately $900 million in inventory, has over a thousand employees, and dispensed more than 2.3 million prescriptions to nearly half a million patients nationwide in 2025. Peppers Decl. ¶¶9, 23-24. And Accredo cannot simply absorb this volume through its other pharmacy locations, which lack the necessary capacity and manpower. *Id.* ¶24. Rather, based on their experience both decommissioning and starting up other pharmacy operations, Plaintiffs estimate that (as detailed in the attached declaration from Susan Peppers) completing all the necessary steps to close Accredo's Memphis pharmacy, stand up a new pharmacy hub in another state to replace the lost capacity, and obtain the necessary licenses to serve patients in all 50 states and U.S. territories, plus various accreditations, will cost more than $100 million. *Id.* ¶¶36-41. To maximize their ability to complete the process by July 1, 2028, Plaintiffs will have to begin almost immediately, thereby starting to accrue those costs. *Id.* ¶¶36-40.

In total, the expenditures the Act compels are imminent and massive. And because they are unrecoverable due to state sovereign immunity, they constitute the requisite irreparable harm.

## C. Loss Of Patient Relationships

Finally, the Act will also irreparably harm Plaintiffs imminently, by ending their relationships with patients across Tennessee and thereby destroying the goodwill those relationships embody. "The loss of customer goodwill often amounts to irreparable injury because

19

the damages flowing from such losses are difficult to compute." *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992). And where there is "a realistic prospect of lost sales and market share" that would harm "goodwill and competitive position in ways that would be hard to compensate," preliminary relief is warranted. *Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015).

Plaintiffs' relationships with their Tennessee patients are built on trust developed over many years. *See, e.g.*, Thompson Decl. ¶¶6-12. As noted, Plaintiff pharmacies served more than 180,000 Tennesseans and filled over 2 million prescriptions for Tennessee patients in 2025. Peppers Decl. ¶19. Many of those patients depend on Plaintiffs for far more than maintenance medications delivered to their homes: Plaintiffs dispense specialty therapies, fertility medications, rare-disease treatments, and drugs available only through limited- or exclusive-distribution networks—meaning there are few or no other sources for a drug—and they pair those medications with pharmacist education and monitoring, home-infusion services, and in-home clinical care. *Id.* ¶¶9, 13-14, 22, 24, 26-29; *see also* Thompson Decl. ¶¶6-12. In 2025 alone, for instance, Accredo nurses made nearly 7,000 home visits and provided more than 10,000 hours of direct care to approximately 460 Tennesseans. Peppers Decl. ¶22.

If the Act takes full effect, Plaintiffs will have to end these relationships. Because the Plaintiff pharmacies will be unable to lawfully dispense drugs in Tennessee, and because Accredo will need to move its Memphis operation to another state, every Tennessee patient that those pharmacies serve today will become someone else's patient. That means all of those patients' goodwill toward the ESI-affiliated pharmacies will be lost. If even a "realistic prospect" of lost sales and market share warrants preliminary relief, *Collins*, 781 F.3d at 279, the certain loss of an entire patient base, and the goodwill that goes with it, assuredly does so.

This damage to Plaintiffs' patient relationships and goodwill will begin imminently. Faced with the prospect that their pharmacy may be unable to serve them after July 2028, many patients—particularly those managing serious conditions who cannot risk any interruption in therapy—will likely transfer their prescription needs to other pharmacies preemptively, rather than wait to see whether Plaintiffs can continue operating. Peppers Decl. ¶33. Indeed, patients have already expressed concern about whether they will be able to continue filling their prescriptions through Plaintiffs' pharmacies. *See* Thompson Decl. ¶¶13, 17.

The injury to Plaintiffs' market position from the loss of patients' business cannot be undone by a later invalidation of the Act. Once a patient's prescriptions are at a new pharmacy, she will likely be unwilling to return even if Plaintiffs ultimately prevail, because switching back would require another round of the same disruption: new transfers of prescriptions and clinical information, and new coordination with prescribers and payors. Peppers Decl. ¶¶32-33. And even patients who wish to return may find that they cannot do so because their health plan sponsors have redesigned their pharmacy networks around the Act, or because drug manufacturers have moved their limited-distribution medications to other specialty pharmacies. *Id.* ¶¶34-35. The resulting loss of patient trust, goodwill, and market position is precisely the kind of injury that damages cannot reliably measure or repair. *Basicomputer*, 973 F.2d at 512.

## III. THE BALANCE OF EQUITIES AND PUBLIC INTEREST FAVOR PRELIMINARY RELIEF

Because Plaintiffs seek to enjoin state action, the balance-of-equities and public interest factors "'merge.'" *Wilson v. Williams*, 961 F.3d 829, 844 (6th Cir. 2020) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)). And that merged factor favors preliminary relief here because "it is always in the public interest to prevent violation of a party's constitutional rights." *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021).

Courts have also recognized a significant public interest in maintaining patient access to health services. In one case, for example, a district court in this circuit granted a preliminary injunction to prevent patients from being "cut off from their life-long physicians and hospitals." *Appalachian Regional Healthcare v. Coventry Health & Life Insurance Co.*, 2012 WL 2359439, at *13 (E.D. Ky. June 20, 2012), *appeal dismissed as moot*, 714 F.3d 424 (6th Cir. 2013). And in another case, a district court in this state likewise preliminarily enjoined the Secretary of Health and Human Services from terminating a hospital's participation in the Medicare and Medicaid programs. *Frontier Health Inc. v. Shalala*, 113 F.Supp.2d 1192 (E.D. Tenn. 2000). The court reasoned that the hospital was "the only psychiatric hospital in the eight easternmost counties of Tennessee which is able to treat the most acutely ill patients," and "[h]aving to move mentally ill people to distant facilities would not only be disturbing to the patients but would take them away from current therapists and family support." *Id.* at 1193-1194.

Similarly here, the Act will imperil access to care for hundreds of thousands of Tennesseans who rely on ESI-affiliated pharmacies, including those whose lives depend on access to specialty medications and military servicemembers and families who rely on the TRICARE program. Absent an injunction, the Act will threaten many patients' continuous access to long-term maintenance medications; leave critically ill patients without personalized, life-sustaining care; unwind the relationships that field nurses have established with vulnerable patients; and deprive Tennesseans suffering from rare or complex conditions of treatments that require the kind of clinical and operational expertise Plaintiffs provide. *See* Peppers Decl. ¶¶32-33; Thompson Decl. ¶¶7-11, 13. These harms to the public confirm that this factor strongly supports immediate injunctive relief.

22

**CONCLUSION**

Plaintiffs' motion for a preliminary injunction should be granted.

June 18, 2026                                        Respectfully submitted,

                                                      */s/ Kevin M. Lamb*
                                                      Jennifer Milici (*pro hac vice* pending)
                                                      Daniel S. Volchok (*pro hac vice* pending)
                                                      Kevin M. Lamb (*pro hac vice* pending)
                                                      Jane E. Kessner (*pro hac vice* pending)
                                                      WILMER CUTLER PICKERING
                                                         HALE AND DORR LLP
                                                      2100 Pennsylvania Avenue N.W.
                                                      Washington, D.C. 20037
                                                      (202) 663-6000 (tel.)
                                                      (202) 663-6363 (fax)
                                                      jennifer.milici@wilmerhale.com
                                                      daniel.volchok@wilmerhale.com
                                                      kevin.lamb@wilmerhale.com
                                                      jane.kessner@wilmerhale.com


                                                      */s/ William L. Harbison*
                                                      William L. Harbison
                                                      L. Webb Campbell II
                                                      William J. Harbison II
                                                      SHERRARD ROE VOIGT &
                                                         HARBISON, PLC
                                                      1600 West End Ave., Ste. 1750
                                                      Nashville, Tennessee 37203
                                                      (615) 742-4200 (tel.)
                                                      (615) 742-4539 (fax)
                                                      bharbison@srvhlaw.com
                                                      wcampbell@srvhlaw.com
                                                      jharbison@srvhlaw.com